13 A.3d 1206

**Franklin MORRIS**

v.

**STATE of Maryland.**

**No. 34, Sept. Term, 2010.**

Court of Appeals of Maryland.

Feb. 23, 2011.

Kellie M. Black, Asst. Public Defender, (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

Don Henley sang, "trying to get down to the heart of the matter," often the "more I know, the less I understand." [1] Apropos of that sentiment, in the present case, the parties brief and argue an array of issues, only a few of which are actually before this Court and which we shall decide. In the process, they glaze the proceedings with a certain degree of opaqueness.

After an extensive review of the record, we conclude that Franklin Morris ("Morris") preserved a confrontation right challenge for our review. Moreover, we hold that the "miscellaneous agreement" (equivalent to a guilty plea agreement), applicable to his codefendant at their joint trial, operated to violate Morris's confrontation right, as protected by the Sixth Amendment of the United States Constitution ("Constitution") [2] and Article 21 of the Maryland Declaration of Rights ("Declaration of Rights"), [3] on the peculiar facts of this case. Furthermore, we resolve that that error was not harmless beyond a reasonable doubt and, accordingly, reverse Morris's convictions.

I.

A. **Factual Background.**

Late one Friday morning, 23 February 2007, Stewart Williams ("Williams") and a compatriot walked into a retail

---

1. "The Heart of the Matter," *The End of the Innocence*, Don Henley, 1989.

2. The Sixth Amendment states, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. CONST. amend. VI.

3. The relevant portion of Article 21 of the *Maryland Declaration of Rights* states that "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him ... [and] to examine the witnesses for and against him on oath...."

store, The Wine Underground, located at 4400 Evans Chapel
Road in Baltimore City. In the midst of unpacking boxes,
Richard Seleany, a store employee, looked up and saw the two
individuals. In the course of his prior employment with The
Wine Underground, Seleany had been robbed. Noticing that
at least one of these men was wearing a hood and a mask, he
assumed another robbery was in the offing. Taking preemp-
tive action, Seleany charged the would-be robbers and a fight
ensued. As the brawl moved out of the store and onto the
sidewalk, Williams drew a semi-automatic hand gun and fired
a single shot, narrowly missing Seleany's head.

The assailants then turned and fled. As they ran toward a
side road, Williams fired a second shot at the store employee,
missing him again. Seleany was unable to get a good look at
the would-be robbers' faces.

Someone, perhaps a neighbor, called the police. One of the
responding police officers, Joshua Galemore, gleaned relevant
information from witnesses at the crime scene, which data he
relayed to police dispatch. In turn, dispatch broadcasted an
alert for a white sedan. Officer Raul Alvarez, sitting in his
marked police cruiser at the corner of Millbrook Road and
Cold Spring Lane and hearing the dispatch, saw a white sedan
matching the description and traveling east on Cold Spring
Lane with two black male occupants.

Alvarez followed the vehicle as it turned right (south) onto
York Road and then left (east) onto Willow Avenue. As the
sedan made this second turn, Officer Alvarez observed what
he believed was the top of a third person's head in the back
seat. Alvarez activated his emergency lights.

Nearby, Officers Steven Weiss and Kenneth Scott were
driving in their unmarked police car. They quickly joined the
"pursuit." The white sedan increased its speed in response.
The two police cars tracked the white sedan to the 600 block
of Willow Avenue, a residential area. The front passenger,
later identified as Williams, ran into a house (numbered 609)
where he stowed a handgun. Police learned eventually that it
was Williams's home.

Alvarez drew his sidearm and approached the white sedan. The driver, Morris, the back-seat passenger, and ultimately Williams were taken into custody. They were transported to the Robbery Division, where Detectives Byron Conaway and Robert Jackson interviewed them separately. Williams provided written and taped statements in which he confessed to the crimes at The Wine Underground. In his taped statement, Williams made clear that he entered the store "to rob ... for cash." "When [he] attempted to rob the store," however, he claimed to have been alone. Once inside, "the worker[, Seleany,] ... rushed towards me .... [and t]he gun fired once in the air." At some point, after the fight had moved outdoors, Williams started "r[unning] towards Falls Road."

Pertinently, the following exchange then occurred.

[Detective]: After you ran towards Falls Road, how did you get into the white [sedan] where the police attempted to pull you over?

[Williams]: Basically, I just entered it.

[Detective]: And the person driving, did they drop you off at your house in front of the door?

[Williams]: Yeah.

\* \* \*

[Detective]: What color was the vehicle that you got into at the scene?

[Williams]: White.

[Detective]: What kinds of articles of clothing did you have? Like, what was the description of the clothing that you had on?

[Williams]: Blue jeans, black shirt and I think I had on—I forgot what hoody I had on. I had a hoody.

[Detective]: You had a hoody?

[Williams]: Yeah.

[Detective]: Did you have a black mask on?

[Williams]: Not a mask, but like a shirting, a shirt sleeve.

[Detective]: A shirt sleeve that you, is like a makeshift mask? Did it look like a mask?

[Williams]: Some, yeah.

[Detective]: What color was that?

[Williams]: Gray. Like black-gray. It was faded, though, so I would say gray.

A search warrant was obtained for 609 Willow Avenue. Detective Conaway, while executing the warrant, discovered a handgun in the basement of the house. A ballistics examination revealed that a shell casing, recovered from the scene of the attempted robbery, had been fired from the weapon. A subsequent (and authorized) search of the white sedan yielded a piece of black cloth, along with other black items of clothing.

For his part, Morris denied any involvement with the attempted armed robbery. At trial, he testified that, over the course of a fifteen-year friendship, Williams had telephoned him often and asked for rides—approximately 40–50 times. On the morning of 23 February 2007, Williams assertedly phoned Morris around 11:30 a.m., asking to be picked up at the corner of Falls Road and Coldspring Lane. When Morris and his white sedan arrived at that location, Williams was not there, so Morris called Williams's cell phone number. According to Morris, when Williams and another man arrived, Williams was not "out of breath[.]" Williams asked Morris to drive him home and, with no query or volunteering about what the two men's recent activities had been, off they drove.

When Officer Alvarez activated his vehicle's emergency lights, Morris did not pull over the car and stop immediately because he claimed not to have noticed the lights. Upon hearing the police cruiser's siren, however, he stopped the sedan, albeit virtually at the intended destination—Williams's house. Morris believed initially that he was pulled over for the expired temporary tags on his car.

### B. Procedural History.

On the theory that Williams was the gunman/robber and Morris the getaway driver, the State charged both men with

various offenses and sought a joint trial in the Circuit Court for Baltimore City. The morning of the trial dawned with a predicament—although Williams and the State had discussed a plea agreement previously, Williams announced that he desired a bench trial, while Morris wanted a jury to decide his fate. Remarking that the Court of Special Appeals "strongly disapprove[s]" of a simultaneous bench and jury trial, *see Nair v. State,* 51 Md.App. 234, 239, 442 A.2d 196, 199 (1982), *cert. denied,* 293 Md. 617 (1982), the trial judge "suggest[ed]" that, "if the State is [still] seeking to keep the co-defendants together," "we could enter into a miscellaneous agreement where at the end of the proceeding, [Williams] would be the beneficiary of [the aforementioned proposed] plea agreement [to which] the State has kind of grudgingly acquiesced...." [4]

In particular, the judge proposed that, in exchange for an agreed upon sentence of seventeen years, suspend all but ten, Williams would "stand trial by jury along with [Morris], [so that] the State [has] got the Defendants side by side." During the trial itself, however, Williams and his counsel simply would "be[ ] there and contribut[e] nothing to [it]"—that is, Williams would "waive opening and closing argument, [and] assert the Fifth...." Nonetheless, he would retain "the right to argue [a] Motion for Judgment of Acquittal just in case the State's case goes sour on it and a witness doesn't testify or anything like that." In later pre-trial exchanges, Williams, the prosecutor, and the judge added additional conditions to the "miscellaneous agreement"—Williams would waive peremptory jury challenges, but retain his right to cross-examine witnesses.[5]

---

**4.** During the subsequent sentencing hearing, Williams's counsel illuminated somewhat further why his client chose the route he did—"it was the State's intention originally to allow [Williams] to enter into this plea and that is why we didn't go with a court trial."

**5.** The following exchange took place:

[Williams's Counsel]: I wanted the Court's guidance on that in terms of—I mean, I don't want to make it seem like we're not participating either. I don't know how that would happen.
[Morris's Counsel]: Maybe you're not.
[Williams's Counsel]: Well I know, but—

Moreover, if the jury found Williams guilty, as was contemplated would occur in all likelihood, the State would drop additional charges against Williams, stemming from an unrelated incident; otherwise, the State would be permitted to proceed on those separate charges.

After a brief recess, Williams expressed his desire to "take advantage of the Court's offer...." Morris, however, objected and sought a severance, arguing that "the Court has made an agreement ... [that is] beneficial to the State .... [b]ecause obviously the State would ... like to be in the position to try both of the Defendants at one time...." Countering, the trial judge averred that "[Williams's presence] is not adding anything to the jury trial." "If there were no agreement," he continued, the jury trial would *not* unfold differently— "[Williams would] still [assert] the Fifth and you'd not be able to get him to testify." (Emphasis added.)

Morris's counsel persisted, claiming (erroneously) that, but for this "miscellaneous agreement," he would be able to call and interrogate Williams on the witness stand during Morris's defense case in the joint trial. The objection was overruled. The State then made clear its intention to use Williams's pretrial statements, "since the State still has to prove to a jury Mr. Williams's guilt beyond a reasonable doubt." In the State's eyes, Williams's statements "in no way facially incriminate[ ], or facially make[ ] reference to, anybody else," so they would be used only against Williams. Although Morris sought initially a severance, contesting the State's proposed use of the statements, he withdrew ultimately his objection.

After another recess, Morris changed his mind and renewed his objection to the State's intended introduction of Williams's statements. Apparently, during the break, Morris's counsel obtained a copy of the statements and concluded that they inculpated, albeit indirectly, his client; according to Morris's

---

[Trial Judge]: Ask questions in cross if you want, don't ask them if you don't want. And just waive your opening, waive your close. You're still participating in the sense that if the State's case falls apart, you can move for judgment of acquittal.

counsel, the statement "puts my client into the mix" by placing his pick-up of Williams closer to the scene of the attempted robbery than did Morris's pre-trial version of the events and, therefore, "further[s] my argument as to severance." The parties and the judge then engaged in a discussion about implications for the situation from *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and related cases. The gist of this discussion was that, even if a court delivers a limiting instruction, the confession of a co-defendant in a joint trial, which incriminates facially the other co-defendant, may not be admitted against that co-defendant—unless the original co-defendant is available for cross-examination. The confession *may* be admitted, however, if redacted or otherwise altered so that it is incriminating only "when linked with evidence introduced later at trial. . . ." *Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176, 186 (1987). In the present case, the trial judge determined that Williams's statement was "linkage," rather than "[*Bruton* ] evidence," and, thus, he overruled Morris's objection.

The joint trial commenced. Williams did not participate in voir dire, did not make an opening or closing statement, did not cross-examine any witness, and generally did not present a defense. Furthermore, the judge was not asked to, and did not, instruct the jury that Williams's statements should not be considered as regards Morris guilt or innocence. Ultimately, the jury found Morris, as a principal in the second degree, guilty of attempted robbery with a dangerous weapon; first-degree assault; transporting a handgun in a vehicle; use of a handgun during a felony or crime of violence; and conspiracy to commit robbery with a dangerous weapon.[6] Thereafter, the trial judge sentenced Morris to twenty years incarceration for first-degree assault and, after merging attempted robbery into

---

6. The jury acquitted Williams of attempted first-degree murder, but convicted him of attempted second-degree murder; attempted robbery with a dangerous weapon; first degree assault; wearing, carrying, or transporting a handgun; use of a handgun during a felony or crime of violence; and conspiracy to commit robbery with a dangerous weapon.

first-degree assault, concurrent twenty-year sentences for use of a handgun in a crime of violence and conspiracy.

Morris appealed to the Court of Special Appeals. His brief in this Court summarized well our intermediate appellate colleagues' treatment of that appeal.

On appeal, Mr. Morris argued that the trial court erred in permitting Mr. Williams to be tried "alongside" Mr. Morris under the "miscellaneous agreement," because the sham joint trial defrauded the jury and permitted the State to circumvent Mr. Morris's Confrontation Clause rights. Additionally, Mr. Morris argued that the trial court erred by permitting Detective Conaway to testify that the items recovered from Mr. Morris's vehicle were "described on the scene of the robbery," and that the trial court compounded this error by questioning Detective Conaway about these items. The Court of Special Appeals rejected both arguments.

[In an unreported opinion, t]he Court of Special Appeals characterized the first argument ... as a *"Crawford [v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ] argument," and held that Mr. Morris had "waived his *Crawford* argument for appeal" by giving "testimony virtually identical to that portion of the statement that he is complaining about." Additionally, the court concluded that Mr. Williams'[s] statement did not inculpate Mr. Morris, and, moreover, that "it supports [Morris's] own testimony and therefore is exculpatory." With respect to the issue regarding the detective's testimony, the Court of Special Appeals concluded that this testimony "served the limited purpose of establishing why he seized certain articles of clothing," and that, in any event, the testimony "did not harm the appellant any more than the evidence already admitted."

We granted Morris's petition for writ of certiorari. *Morris v. State,* 414 Md. 330, 995 A.2d 296 (2010). Based on the parties' briefs, as well as their oral arguments, there exists confusion, however, over what issues are actually before this

Court. By reordering the questions presented in the success-
ful petition for certiorari—and discussing the relationship
between severance and *Crawford* in these circumstances—we
endeavor to provide needed clarity.

([1]) Did [the Court of Special Appeals] properly find
Petitioner did not argue that the trial court's severance
ruling was in error and that Petitioner waived his *Crawford*
argument?

([2]) Should this Court decline to review Petitioner's affir-
matively waived complaint about his joint trial when the
[Court of Special Appeals] found that he did not argue that
the trial court's severance ruling was in error in his opening
brief or reply brief?

(3) Did the [Court of Special Appeals] correctly find that
the trial court properly admitted a detective's testimony for
a limited purpose and merely asked appropriate clarifying
questions?

## II.

### A. Preservation Contentions.

Morris acknowledges that he did not raise below, and is not
raising here, "a simple, traditional severance issue...." He
concedes also that he is not "rais[ing] a *Bruton* issue in this
appeal." Instead, he unfurls a broad "sham trial" tent,
propped up by at least two supporting arguments. In particu-
lar, Morris avers, as he did before the Court of Special
Appeals, that "the trial court erred by authorizing the sham
'joint trial' in this case, and that the circumvention of *Craw-
ford* was [but] *one* of the harms inflicted by this error."
(Emphasis added.) Presumably, the second harm inflicted by
this "sham 'joint trial' " is the "defraud[ing of] the jury...."
Morris relies on *State v. Bowers*, 349 Md. 710, 724, 709 A.2d
1255, 1262 (1998), for the precept that "[o]ur cases never
intended to permit juries to be mislead." (Citation omitted.)

The State rejoins that Morris's "current complaint ... is
not preserved for appellate review; even if preserved, he lacks
standing to advance it; even if he has standing, his complaint

has no merit." First, the State highlights that, at trial, Morris objected on two grounds, one erroneous—but for the "miscellaneous agreement," he would have been able to call Williams as a witness at their joint-trial—which we shall not consider further, and the other based on *Bruton.* Before the Court of Special Appeals, however, Morris abandoned these trial objections and articulated that this was a "sham trial" which violated "Morris's confrontation clause rights" and "defrauded the jury...." The abandonment of his trial objections, according to the State, should prevent Morris from raising substantively different arguments on appeal.

■ Second, the State remonstrates that, even if Morris preserved a "sham trial" argument, "any complaints about its validity should come from Williams, not Morris." Only those injured by an action have standing to object to it.[7] Finally, responding to the merits of Morris's appellate argument, the State counters that Morris's "sham trial"/*Crawford* argument is "based on the incorrect premise that Williams was not on trial." To the State, Williams was on trial. The State, Williams, and the trial court had not formed a plea agreement. Rather, Williams struck an agreement with the State and trial court, "whereby his sentence would be capped in return for dropping his demand for a bench trial."

In the State's words:

Williams went before the jury "cloaked in the presumption of innocence[,]" and the State was obligated to prove the

---

7. We dispatch with the State's standing argument in this footnote. Morris, indeed, would face formidable standing problems, if he attempted to object to how Williams waived his rights, without a thorough on-the-record colloquy, *see Cubbage v. State,* 304 Md. 237, 240, 498 A.2d 632, 634 (1985) (reiterating that waivers of rights must be knowing and voluntary), or to the trial judge's active participation in the negotiation process, *see Barnes v. State,* 70 Md.App. 694, 707, 523 A.2d 635, 641 (1987) (holding that a "trial judge ... [may not] improperly interject[ ] himself into the plea bargaining process as an active negotiator" as that "infring[es] upon the function reserved to counsel in the adversary process"). Morris, however, protests how the "miscellaneous agreement" impacted his personal right to confront witnesses presented against him. As such, he satisfies the standing requirement.

elements of the offenses against him beyond a reasonable doubt. *Gerald v. State*, 299 Md. 138, [144–45, 472 A.2d 977, 981] (1983[1984]). The jury could have acquitted Williams on some or all of the charges against him—and indeed did acquit him of attempted first degree murder. Williams essentially agreed to exercise his right to a jury trial in return for a guaranteed sentence, but enjoyed the possibility of an acquittal whether from a failure of the State's evidence, leniency on the part of the jury, or some unforseen structural error in the conduct of the trial. As this Court noted in *Smith* [*v. State*, 375 Md. 365, 377–78, 825 A.2d 1055, 1062–63 (2003)], a defendant may waive any number of rights, constitutional or otherwise, as part of a negotiated agreement. Williams was entitled to specific performance of the court's agreement notwithstanding the State's lack of participation in the agreement. "Like a plea agreement, an agreement to cap the sentence in exchange for a waiver of the right to a jury trial should be enforceable." *Ogonowski* [*v. State*, 87 Md.App. 173, 185, 589 A.2d 513, 519 (1991)]. There is no principled basis for arguing that the same is not true when a sentence cap is offered in exchange for exercising the right to a jury trial.

Assuming that there was a bona fide trial, the State claims that certainly it was within its right to use Williams's statement to prove Williams's guilt. The fact that Morris also was on trial demanded only that the State follow the redaction requirements of *Bruton* and *Marsh*, so that Williams's statement did not incriminate inadvertently Morris. As Williams's statement did not so inculpate Morris, and, in any event, Morris "expressly" waived his *Bruton* argument, Williams's statement was admitted properly. *Crawford*, the State entreats, is inapplicable, as it concerns the Sixth Amendment right of an accused to confront witnesses against him or her. Because Williams's statement was used against Williams alone, any *Crawford* concerns evaporate.[8]

---

8. In *Gray v. Maryland*, 523 U.S. 185, 192, 118 S.Ct. 1151, 1155, 140 L.Ed.2d 294, 301 (1998), the Supreme Court reconsidered *Bruton* and

■ The Court of Special Appeals determined that Morris did not challenge, on appeal, "the trial court's severance ruling," "its *Bruton* ruling," or the impact of *Crawford.* ("[Morris] is correct that he made a *Crawford* argument [to the trial court] .... as part of his severance and *Bruton* arguments, [none of] which ... are ... raised on appeal."). Nonetheless, it acknowledged, paradoxically that, "[i]n his opening brief, [Morris] contends the 'miscellaneous agreement' " violated "his Sixth Amendment confrontation rights under *Crawford.* ..." "[Morris] maintains that, *if* he had been tried separately from Williams," the intermediate appellate court continued, "Williams's statement would not have been admitted into evidence at his ( [Morris's] ) trial. ..." Thus, it appears—in the Court of Special Appeals's own words and Morris's brief in that court—that Morris, in fact, *did* raise properly a *Crawford* argument on appeal.

■ Morris gathers not only *Crawford,* but also jury deception under his "sham trial" tent. Under the weight of preservation principles, however, his tent buckles on the latter point. Nonetheless, Morris adequately, if not inarticulately, preserved his *Crawford* claim. Before the trial court, Morris's counsel did not rely initially on any particular case, but focused rather on his client's general confrontation rights. As *Crawford* is grounded in Sixth Amendment confrontation right principles, we conclude that Morris asserted, *at trial,* a *Crawford* complaint, "albeit tangentially." (Emphasis added.)

■ The Court of Special Appeals—regarding its perception that Morris failed to maintain his confrontation argument before it—begins with its identification of a sharp contrast between the "trial court's severance ... [and] *Bruton* ruling[s]," and Morris's " 'sham trial'/confrontation right" argument. Morris objected to the former at trial, but, according to

---

*Marsh,* stating that "[r]edactions [which] simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration ... leave statements that ... closely resemble *Bruton's* unredacted statements" and are similarly inadmissible.

the intermediate appellate court, raised the latter—character-
ized as a wholly different claim—on appeal. We fail to see so
clear a distinction. Instead, by raising confrontation concerns
before the Court of Special Appeals, Morris was not merely
alleging error in the admission of Williams's statements. *But
see Morris v. State,* No. 455, September Term, 2008, slip op. at
13 (Md.App. February 4, 2010) ("[Morris] contends the 'mis-
cellaneous agreement' ... prejudiced him because the State
was able to introduce into evidence Williams's recorded state-
ment without regard for his ... confrontation rights...."). 
He was taking issue directly with the "trial court's severance
ruling...." [9]

Although Morris's trial counsel did not state clearly that he
was seeking a severance "because the miscellaneous agree-
ment was simply a subterfuge or sham, by which the State
could admit Williams's statement against Morris in violation of
*Crawford,*" he did object to "the agreement ... as ... benefi-
cial to the State" and, presumably, unduly prejudicial, to his
client. He also stated that he wanted a severance (not simply
a redaction pursuant to *Bruton)* because the State proposed to
admit a statement which "connect[s]" Morris more proximate-
ly to the crime scene and "actually hurts my client." ("[W]hat
I think [Williams's statement] does, [is] to further my argu-
ment as to severance—."). On this record, we conclude that
Morris preserved, albeit tangentially, a claim that severance
was proper, in light of an impending Confrontation Clause

---

9. Morris argues that, because the statement was not admissible against
 him had he been tried separately, the trial court was required, "as a
 matter of law," to grant his severance request. In support of this
 assertion, Morris directs our attention to *Osburn v. State,* 301 Md. 250,
 482 A.2d 905 (1984). For joinder to be proper, a trial court first asks
 whether "the evidence offered [is] mutually admissible as to each
 defendant...." *Osburn,* 301 Md. at 254, 482 A.2d at 907 (citing
 *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977)). If not, the trial
 court then considers the "possibility of significant damage[, or preju-
 dice,] ... by evidence ... admissible [only] against a co[-]defen-
 dant...." *Eiland v. State,* 92 Md.App. 56, 73, 607 A.2d 42 (1992), *rev'd
 on other grounds, Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993). If
 the evidence is not mutually admissible and prejudices the defendant
 (against whom it is inadmissible), then severance is proper normally.

violation caused by the existence of the "miscellaneous agree-ment" (*i.e.*, the joint trial).[10]

## B. Waiver of Appellate Arguments.

■ Although determining that Morris did *not* raise a *Crawford* argument on appeal, the Court of Special Appeals continued, holding that even if he had, the ultimate issue was waived. That is because, at the trial level, Morris took the stand in his own defense and gave testimony "virtually identi-cal to the portion of [Williams's] statement that he is com-plaining about." Relying principally upon *Tichnell v. State*, 287 Md. 695, 715–16, 415 A.2d 830, 841(1980), the intermediate appellate court observed that a defendant "waive[s] his objec-tion to the admission of ... contested evidence," where he challenges initially the admission of certain evidence, but subsequently "confirm[s]," through his "own testimony," "the evidence to which he had previously objected...."

Morris counters with *State v. Logan*, 394 Md. 378, 390, 906 A.2d 374, 381 (2006), in which we stated that a "defendant does not waive an error by attempting to minimize or explain improperly admitted evidence." We perceived that "[i]t would be unfair to permit the State to introduce evidence, albeit later found to be inadmissible, but not to permit the defendant, upon pain of waiver, to attempt to meet it, explain it, rebut it or deny it." *Id.*

Based on our reading of the record, it appears to us that Morris took the stand to try to explain, if not rebut, his seeming involvement as the pre-ordained getaway driver. The characterization of him as the getaway driver was based partly on the officers' testimony, which, among other things, placed Williams in Morris's white car shortly after the at-tempted robbery. Williams's statement, however, also identi-

---

10. Stated another way, Morris's counsel (1) objected to the miscellane-ous agreement, (2) raised confrontation right concerns, and (3) sought a severance as a consequence. Taken together, we think he fairly pre-served the substance of some, but not all, of the question framed on appeal.

fied Morris, but in an indirect, subtle, and potentially conflicting way. Earlier in his confession, Williams indicated that, after the botched robbery attempt, he "ran towards Falls Road." In response to the question, "[w]hat color was the vehicle that you got into *at the scene,*" however, Williams said "[w]hite," without acknowledging—let alone delimiting—the inquisitorial phrase "at the scene." When Morris took the stand at trial, he tried to explain his version of the origin and nature of his encounter with Williams on the date in question and, thereby, establish his "unwitting participant" defense. Without more, we must assume Morris was doing so in response to both the police testimony and Williams's statement.

We determine that Morris raised—and did not subsequently waive—his severance and *Crawford* arguments (indeed, they are one and the same). We also disagree with our appellate colleagues that Morris "affirmatively waived [his] complaint about his joint trial . . . ."

### C. Morris's Confrontation Right Argument.

#### 1. Was There a Bona Fide Trial of Williams?

 Before this Court, Morris alleges more specifically that the "miscellaneous agreement," which facilitated the joint trial with his co-defendant, allowed the State to circumvent *Crawford* and, thereby, violate his right to confront a witness against him. *Crawford* may be implicated when the State proposes to use a prior, out-of-court statement against a non-declarant. *See Crawford,* 541 U.S. at 59, 124 S.Ct. at 1369, 158 L.Ed.2d at 197. The State disagrees with Morris, arguing that *Crawford* "has no applicability . . . for the simple reason that [the statement] was used against [the declarant,] Williams, not . . . Morris." After all, as this argument goes, the State had to make its case against Williams, or so it claimed. As such, *Bruton* provides the proper analytical framework because it addresses the use of a prior, out-of-court

statement against the declarant himself, in a joint trial.[11]

We might agree with the State, had the joint trial been bona fide as to the prosecution of Williams. Were that the case, our analysis would examine whether the taped statement was redacted sufficiently, or otherwise altered, to not incriminate Morris, as Williams did not subject himself to cross-examination by taking the stand. We conclude, however, that this was not a bona fide trial, at least not as that term has been defined by the Constitution, the Declaration of Rights, and the Maryland Rules. As a result, *Crawford* is at the heart of the matter. We explain.

In its consideration of this point, the Court of Special Appeals agreed with the State regarding the bona fide nature of the joint trial. The "'miscellaneous agreement' applied only to sentencing," it reasoned, and so "[t]he State was still required to prove criminal liability against Williams...." In arguing that the "miscellaneous agreement" is most akin to a sentencing cap, the State relied upon *Smith* and *Ogonowski, supra.*

---

11. As aptly stated by the Kentucky Supreme Court in *Commonwealth v. Stone,* 291 S.W.3d 696, 700 (Ky.2009):

> *Bruton,* [*Marsh* ], and cases descending from them, address the dilemma that arises when two or more defendants are jointly tried, and one (or more) of them has made a voluntary out-of-court statement which the prosecution wishes to present as evidence at trial. While a defendant may be incriminated by his own voluntary out-of-court statement without offending the rule against hearsay or the Sixth Amendment right of confrontation ..., *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the use of such statements against another defendant violates the hearsay rule ..., and, if the declarant is not subject to cross-examination, the Sixth Amendment right of confrontation. *Bruton,* 391 U.S. at 129, 88 S.Ct. 1620....
>
> \* \* \*
>
> *Crawford,* on the other hand, applies when the out-of-court statement is offered as evidence against a defendant other than the declarant. *Crawford* holds that a defendant is denied his Sixth Amendment right to confront his accusers by the introduction into evidence of an out-of-court "testimonial statement" made by a declarant who is unavailable for cross-examination. *Crawford,* 541 U.S. at 69, 124 S.Ct. 1354.

In *Smith*, the defendant agreed to waive his right to a jury trial and proceed with a bench trial. *See Smith*, 375 Md. at 369, 825 A.2d at 1057–58. In exchange, the State consented to, among other things, drop "four of five charges and . . . to [recommend] a sentence cap of 10 years without parole. . . ." *Smith*, 375 Md. at 387, 825 A.2d at 1068. The judge bound himself to the sentencing cap agreement. *See Smith*, 375 Md. at 381, 825 A.2d at 1065.

Like *Smith*, *Ogonowski* involved a defendant bargaining away his right to a jury trial, in exchange for a sentencing cap. *See Ogonowski*, 87 Md.App. at 175, 589 A.2d at 514. The State initially offered a plea bargain, in return for a sentence of ten years. *See Ogonowski*, 87 Md.App. at 176, 589 A.2d at 514. The trial judge then agreed to impose ten years, if the defendant pleaded guilty. *See id.* The defendant, however, asked whether the court would "be willing to make the same cap in a—if the case was tried before the Court?" *Ogonowski*, 87 Md.App. at 176, 589 A.2d at 515. The trial judge consented, without objection from the State. *See Ogonowski*, 87 Md.App. at 178, 589 A.2d at 515. Acknowledging there are no "rules governing conditions attached to such a waiver," the Court of Special Appeals declined nonetheless "to declare that these agreements are void" and, instead, "conclude[d] that the most appropriate vehicle for analysis is that of a contract." *Ogonowski*, 87 Md.App. at 183, 589 A.2d at 518. In determining the appropriate remedy for the trial court breaching the agreement, the intermediate appellate court compared the waiver to a plea agreement, stating, "like a plea agreement, an agreement to cap the sentence in exchange for a waiver of the right to a jury trial should be enforceable." *Ogonowski*, 87 Md.App. at 185, 589 A.2d at 519 (citation omitted).

Although the legal arguments involved in *Smith*[12] and

12. It appears the judge agreed to the sentencing cap, before remarking "that [Smith] certainly will make a better decision, I think, as far as sentencing is concerned, if he is found guilty by the Court than if he is found guilty by a jury. . . ." *Smith*, 375 Md. at 381, 825 A.2d at 1065. Smith's counsel argued that this comment came *before* his client's waiver and, therefore, impacted improperly his client's ultimate waiver

*Ogonowski* [13] are not relevant for present purposes, the State points out that both cases condoned an agreement where a defendant uses his right to a jury trial as a bargaining chip in exchange for a sentencing cap. The fact that Williams agreed to waive multiple rights (both constitutional and procedural in nature) associated with presenting a defense, the State argues, is inapposite, as *Smith* approves the notion that " '[t]here are few, if any instances where a criminal defendant is prohibited from surrendering his rights, be they constitutional or otherwise....' " *Smith,* 375 Md. at 378, 825 A.2d at 1063 (quoting *State v. Magwood,* 290 Md. 615, 619 n. 2, 432 A.2d 446, 448 n. 2 (1981) (citation omitted)).

In *Smith* and *Ogonowski,* the fact that the defendants retained all of their rights, aside from the right to a jury trial, was important. The ensuing bench trials were actual trials. Stated another way, the defendants possessed the right to mount a defense. In the case *sub judice,* the "miscellaneous agreement" required Williams to assert the Fifth and, thereby, waive his constitutional right to testify, a precept elucidated in *Rock v. Arkansas,* 483 U.S. 44, 49–50, 107 S.Ct. 2704,

---

decision. *Smith,* 375 Md. at 368, 825 A.2d at 1057. According to Smith, the comment made it "unequivocally ... [clear] that [the trial judge] would impose a harsher sentence if [Smith] were found guilty after a jury trial, as opposed to a court trial." *Id.* Such coercion, the defendant persisted, violated his jury trial right. *See id.* We held that Smith's waiver was proper, as "the trial judge's statement was ambiguous, not unequivocal, and, most importantly, was made after [Smith's] counsel had initially indicated, without objection from his client, that [Smith] had already chosen to waive his constitutional right to a jury trial." *Id.*

13. In *Ogonowski,* the trial court broke the "miscellaneous agreement" because, after a guilty verdict had been rendered, but before sentencing, Ogonowski was arrested for drug distribution-related offenses. *See Ogonowski,* 87 Md.App. at 181, 589 A.2d at 517. The trial court held that obeying the law was an implicit condition of the agreement and, thereafter, imposed a sentence exceeding the agreed-upon ten years. *See Ogonowski,* 87 Md.App. at 182, 589 A.2d at 518. The Court of Special Appeals held that "[t]he agreement had limited terms" and declined to rewrite it. *Ogonowski,* 87 Md.App. at 184, 589 A.2d at 518. As such, it vacated the violative sentence. *See Ogonowski,* 87 Md.App. at 188, 589 A.2d at 520.

2708, 97 L.Ed.2d 37, 44–45 (1987). Moreover, pursuant to the agreement, Williams could not make an opening statement or a closing argument. *See Spence v. State,* 296 Md. 416, 419, 463 A.2d 808, 809 (1983) ("It is well-settled ... that the opportunity for summation by defense counsel prior to verdict ... is a basic constitutional right guaranteed by Article 21 of the Maryland Declaration of Rights and the Sixth Amendment to the United States Constitution as applied to the States by the Fourteenth Amendment."); *Baltimore v. Hurlock,* 113 Md. 674, 677, 78 A. 558, 559 (1910) (referring to "[t]he *right* to open *and* close") (emphasis added). Finally, Williams also had to waive his right to peremptory jury challenges, as afforded under Maryland Rule 4–313.[14]

■ Considering the aggregate effect of these additional and substantial waivers, we believe—as the trial judge in this case framed it—Williams was not really "contesting guilt or innocence"—that is, "he did not put on any defense." [15] It is one thing for a defendant to waive his right to a jury trial; it is quite another for that defendant to waive his rights to take the stand in his own defense, to present opening and closing statements, and to question the biases of the very citizens selected to decide his guilt or innocence. Compared to *Smith* and *Ogonowski,* our conclusions here are fairly straightforward: a defendant may waive (or agree to exercise, as is the current situation) his right to a jury trial, in exchange for a sentencing cap, and the proceedings may partake of a trial.

---

14. To address the possible occurrence of a "manifest injustice," which may result from Williams's waiver of this right, the trial judge allowed creatively that, if necessary, Williams would get "one or two" challenges, and the State would thereafter get "half...." This pressure valve was not utilized.

15. The trial court's full comment at the sentencing hearing—in response to the State's assertion that "[Williams] did not plead guilty, he did have a trial—was "[w]ell, if we severed, they could still put your client's [Morris's] words in. So how does the presence of [Williams] who may have the right to a separate trial under [*Bruton* ] if he were contesting guilt or innocense affect the presentation of the evidence that's admissible against your client?"

Where a defendant waives, in essence, his right to present a defense, the proceedings are not entitled to be so characterized. In so ruling, we note that the principle that a defendant may waive nearly all of his or her rights, *see Smith* and *Magwood, supra,* appears almost singularly in plea agreement, not sentencing cap, cases.[16] See *Brookhart v. Janis,* 384 U.S. 1, 7–8, 86 S.Ct. 1245, 1248–49, 16 L.Ed.2d 314, 318–19 (1966) (explaining that, for a defendant to plead guilty, he or she must also waive the right to a jury trial, to confront witnesses, and the privilege against self-incrimination).

We grant, as the State notes, that "[t]he jury could have acquitted Williams on some or all of the charges against him— and indeed did acquit him of attempted first degree murder." The likelihood, however, of the jury acquitting Williams on all charges was greatly diminished (if not negligible), as Williams, in fact, did not contest his guilt. In *Sutton v. State,* 289 Md. 359, 365–66, 424 A.2d 755, 759 (1981), we confronted an illustrative situation, in which the parties agreed to proceed on an agreed statement of facts, and, as a result, the defendant "waiv[ed] her right to a jury trial, to confront witnesses, [and] to testify...." She also waived her right, however, to "deny

---

16. We are not commenting indirectly or negatively upon trial courts proceeding by way of an agreed statement of facts, joined with a not guilty plea. In such a situation, the defendant usually waives numerous rights, like the right to confront witnesses against him or her. That is because usually there is no one to confront; after all, there is no factual dispute. Thus, where "[t]here is no fact-finding function left to perform[, t]o render judgment, the court simply applies the law to the facts agreed upon." *Barnes v. State,* 31 Md.App. 25, 35, 354 A.2d 499, 505 (1976). With these agreed statements, however, the defendants are contesting still their guilt and usually argue at least sufficiency of the evidence.

In the instant case, there were myriad, outstanding factual issues, the resolution of which required traditional trial mechanisms. *See id.* (intermediate appellate court ordered a new trial because, by offering only stipulated-to conflicting evidence, the parties deprived the judge/ fact-finder from evaluating the credibility of live witnesses or the reliability of evidence. As a result, "there was no proper way to resolve the evidentiary conflicts ... to determine ultimate facts which would be sufficient in law to sustain a verdict of guilty"). Moreover, Williams was not, in the final analysis, challenging his guilt.

the allegations of assault" and "was told that the trial court had indicated that she would be placed on probation. . . ." *Id.*

As a result,

> [t]he State . . . presented an agreed statement of facts that delineated conduct that showed an apparent assault and that raised no defense. At the close of the State's case, the [defendant], "merely for the record," made a motion for judgment of acquittal that was denied. Thereafter, she presented no evidence and renewed her motion for judgment of acquittal that was again denied.

*Sutton,* 289 Md. at 366, 424 A.2d at 759.

We acknowledged that "[t]rying a case on an agreed statement of facts ordinarily does not convert a not guilty plea into a guilty plea." *Id.* (citations omitted). Based on "the totality of the circumstances, and in particular, the facts that the [defendant's] plea was entered at the direction of the trial court and that she was aware that she would be placed on probation," we held that "the proceeding was not in any sense a trial and offered *no reasonable chance* that there would be an acquittal. Under these particular circumstances, the [defendant's] plea was the functional equivalent of a guilty plea." *Id.* (emphasis added).

In the present case, Williams waived his right to a jury trial, to confront witnesses, to testify, and to make opening and closing arguments. Moreover, he also waived his right to deny the State's allegations and, in fact, was told what sentence to expect. He, of course, preserved his right to move for judgment of acquittal, should the State fail unexpectedly to present a prima facie case against him, a truly long-odds bet in view of Williams's pre-trial statements. Thus, such a motion appeared cosmetic and "for the record." Moreover, although nominally reserving his right to cross-examination, he engaged in no such exercise. In view of the totality of the circumstances, the proceeding was not a trial as to Williams's guilt or innocence, in that Williams presented no defense and, therefore, was afforded "no reasonable chance" of a complete acquittal.

2. The Resemblance to a Guilty Plea Agreement.

If anything, the rather peculiar "miscellaneous agreement" in this case resembles a guilty plea agreement (as was the case in *Sutton* ). The State, however, argues that the agreement was simply between the trial court and Williams, unlike a plea agreement, which must involve the State. We believe the State consented to the agreement here explicitly or implicitly. In its brief, the State concedes that "it can be inferred . . . that the State expressed reluctance," when the miscellaneous agreement was being forged, "at giving either defendant an 'empty chair' defense, if at all possible. . . ." Moreover, we doubt whether the agreement would have been struck, in the first place, without the State's acquiescence. Thus, the agreement seems to have been agreed upon by all the parties, including the trial judge, save Morris.

Further demonstrating that this agreement was the functional equivalent of a plea bargain is the fact that Williams was found guilty of attempted second-degree murder. At the sentencing hearing, Williams's counsel voiced concern that "the plea agreement was [only] to the attempted robbery." After some consideration, the trial court agreed to grant a new trial, presuming that the State would then enter the matter *nolle prosequi.* If the proceeding was a bona fide trial, the trial court would not have ordered a new trial and, in the process, overturned the jury's finding of guilt.[17]

In the final analysis, this miscellaneous agreement may be characterized fairly as a plea agreement with escape clauses for the State and Williams. If the State, despite the significant procedural advantages in its favor fashioned by the trial court, bungled presentation of its case against Williams, Williams might have left the courtroom that day as a free

---

17. It appears the State and the trial judge envisioned the miscellaneous agreement as applying only to sentencing, regardless of on which counts the jury returned a guilty verdict against Williams. Williams's counsel wanted the attempted second-degree murder verdict vacated, however, because he feared it would impact adversely the conditions of his client's imprisonment.

man, but the State was free to pursue the unrelated charges against him. In short, it does not appear that Williams, like the defendants in *Smith* and *Ogonowski*, assented simply to face a certain type of fact-finder. Rather, he conceded, in effect, his guilt, pending no extraordinary and clearly unexpected misstep on behalf of the State.[18]

### 3. The *Crawford* Violation and Harmless Error.

From a practical standpoint, this rather unique "miscellaneous agreement" allowed the State to employ an out-of-court statement against a non-declarant, Morris, with regard only to *Bruton,* but not *Crawford.*[19] Had the co-defendants been

---

**18.** Not only may this miscellaneous agreement be compared favorably to a plea agreement, but it may be distinguished from a sentencing cap. From the definition of the word "cap," as well as our caselaw, *see generally Dixon v. State,* 364 Md. 209, 772 A.2d 283 (2001), a sentencing cap provides a ceiling, which may not be surpassed by the trial judge, (continued ...) when he or she imposes a sentence. With the State's consent, however, the judge is able to impose a lesser sentence.

It would have been interesting to see the judge's and State's responses had the jury returned guilty verdicts against Williams only on the lesser counts. It is not clear, under the "miscellaneous agreement," that the trial court had discretion to impose anything less than "17, serve the first 10." For, while crafting the miscellaneous agreement, the trial judge explained that, at sentencing, "you [will] receive your original bargain," which the State initially offered Williams. He did not state that "you will receive a sentence not more than 17, serve the first 10." Indeed, at the sentencing hearing, the State supported this supposition—"it was my understanding that the Court had never made clear what counts, but only made clear what the sentence was." We deem this as further indication of the plea bargain-nature of the miscellaneous agreement. *See Chertkov v. State,* 335 Md. 161, 175, 642 A.2d 232, 239 (1994) ("[I]t is clear that a court that binds itself to fulfill the plea agreement thereby relinquishes his or her right to modify the sentence, thereby imposed, absent the consent of the parties, and, in particular, in the case of reducing the sentence, absent the consent of the State.").

**19.** In his opening statement, the prosecutor stated that, after the attempted robbery, "Stewart Williams and [the third man] run around to the alley ... and Mr. [Seleany] loses sight. In that alley is a ... white Crown Victoria, being driven by Defendant Franklin Morris." Then, he . observed that Williams waived his right to remain silent and gave police a statement, which details how "he fled down towards Falls Road and got into a Crown Victoria and fled the scene."

tried separately, the State could not have used Williams's statement against Morris, pursuant to *Crawford,* unless (1) Morris had enjoyed an opportunity to cross-examine Williams, or (2) the State had obtained a final guilty verdict or plea from Williams, thereby extinguishing his Fifth Amendment right against self-incrimination.[20] In sum, to introduce directly the Williams statement/confession against Morris, the State could have tried Williams first, or it could have refused to go along with the plea agreement and, thereby, force a bona fide joint trial (provided *Bruton* was satisfied). It could not proceed, however, as it did and, ultimately, circumvent *Crawford.*

 This is not to say the violation demands automatically a new trial for Morris. Like any violation of the Confrontation Clause, a *Crawford* violation is subject to harmless error review. *See Davis v. Washington,* 547 U.S. 813, 829, 126 S.Ct. 2266, 2278, 165 L.Ed.2d 224, 241 (2006) (assuming to be correct the Washington Supreme Court's conclusion that a statement violative of *Crawford* was nonetheless harmless); *see also Luginbyhl v. Commonwealth,* 628 S.E.2d 74, 77, 48 Va.App. 58, 64 (Va.Ct.App.2006) (en banc) (citation omitted) ("It is well established that violations of the Confrontation Clause ... are subject to harmless error review, ... and *Crawford* does not suggest otherwise."). As we stated in *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976):

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence com-

---

20. With respect to option two, if the State secured a guilty verdict against Williams, then his right to appeal would need to expire before the State could force him to testify against Morris. In the alternative, if the State obtained a guilty plea from Williams, then it would have him likely waive his right to appeal, as is customary in such circumstances.

plained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

In the present case, the taped statement (1) confirmed that, after the attempted robbery, Williams entered a white sedan, but (2) presented potentially conflicting evidence as to where Williams got into that vehicle vis à vis the crime scene or a more remote location. The former point is cumulative evidence, provided already by the officers, and so we consider it no further in our harm analysis. *See Dove v. State*, 415 Md. 727, 743–44, 4 A.3d 976, 985–86 (2010) (stating that "cumulative evidence," which "tends to prove the same point as other evidence presented during the trial or sentencing hearing," may render harmless otherwise reversible error). The latter point warrants additional reflection. To start, we recall the following exchanges, some of which were alluded to previously in this opinion.

[Detective]: And where did you run[, after the attempted robbery]?

[Williams]: I don't even know where I was at to be honest, but I ran towards Falls Road.

[Detective]: Did you have anybody with you when you attempted to rob the store?

[Williams]: No.

\* \* \*

[Detective]: After you ran towards Falls Road, how did you get into the white [sedan] where the police attempted to pull you over?

[Williams]: Basically, I just entered it.

[Detective]: And the person driving, did they drop you off at your house in front of the door?

[Williams]: Yeah.

\* \* \*

[Detective]: What color was the vehicle that you got into at the scene?

[Williams]: White.

These remarks show that, early in the statement, Williams provided little evidence of a getaway plan ("I don't even know where I was at to be honest, but I ran towards Falls Road."). Then, the detectives adopt, by the premise of their next question, a supposition ("After you ran towards Falls Road...."). They ask about the "person driving," but do not solicit, and do not receive, the driver's identity. Finally, the detectives asked about the color of the vehicle that Williams entered *"at the scene."* Without parsing further the potentially ambiguous reference to "at the scene," Williams responded simply, "[w]hite." This last question and answer, therefore, could suggest—in an indirect and conflicting way—that Morris may have been closer to The Wine Underground than Morris represented in his direct-examination responses.

A reasonable jury could decipher the conflicting evidence, by parsing the wording of the question, and specifically its phrase "at the scene," to connect this indirect evidence in a meaningful way to Morris. Framed rhetorically, but in another way, after the attempted robbery, did Williams "r[u]n toward Falls Road," where he met Morris at Falls Road at Coldspring Lane, or did he dive into Morris's getaway car "at the [crime] scene"? The latter inference endorses the State's theory that Morris was the pre-ordained getaway driver for the intended robbery.[21]

Morris took the stand and explained his exact location on that fateful morning. Such testimony was consistent with his "unwitting participant" defense, raised in response, in part, to Williams's statement. Viewed in its entirety, Morris's testimony addressed as well the victim's and officers' directly incriminating testimony,[22] as well as Williams's statement.

---

**21.** Moreover, Williams was not permitted to and did not take the stand to testify in his own defense. As a result, the jury may have inferred that his pre-trial statement, in its entirety, was uncontested and true. This would have strengthened the prejudice against Morris who was trying, at least in part, to rebuff an implication of the statement.

**22.** Seleany testified that one assailant wore a "mask." Detective Conaway testified that a clothing item capable of being so described was

Therefore, we cannot state, with the requisite conviction, that the error, beyond a reasonable doubt, did not influence the jury's verdict, with respect to Morris's guilt.

## III.

We turn now briefly to two other matters (one of which we shall address for the guidance of the trial court on remand, should there be a new trial), which, though briefed, were discussed infrequently at oral argument. Initially, we consider whether the trial court erred in admitting certain allegedly hearsay testimony. Then, we ponder whether this Court should determine, on our initiative, whether the trial court erred by not issuing a certain limiting instruction.

### A. Hearsay.

■■■ As summarized efficiently by the Court of Special Appeals in its unreported opinion in this case,

> [Morris] contends the trial court erred by admitting into evidence certain improper testimony by Detective Conaway about items he recovered from [Morris's] vehicle; and that the trial judge compounded the error by conducting his own examination of the detective. Detective Conaway gave the challenged testimony after he asked him what items had been recovered from the white [sedan]. The detective responded, "I believe it was a dark t-shirt like cut up, it was a piece of black cloth, and a couple of other items that were black that [were] described on the scene of the robbery." Defense counsel objected and moved the court to strike the

recovered from Morris's car. More specifically, Detective Conaway stated that the item recovered "was described on the scene of the robbery," a remark the admissibility of which we consider separately and later in this opinion for the guidance of the trial court on remand, should a new trial occur. Seleany also stated that there were two assailants—adding the presence of a driver suggests that the police should have found three people in the stopped white sedan, which they did. Officers Alvarez and Weiss observed that, after Alvarez activated his emergency lights, the white sedan sped up.

response. The court overruled the objection and a bench conference ensued.

Based on the argument that the detective had no basis to know what was described at the crime scene, Morris's counsel moved for a mistrial. The State remonstrated that Detective Conaway had "conducted a number of interviews," with Seleany and Williams among others, to which Morris responded that "there's nothing written in any report that said Seleany identified anything out of that car coming from the robbery." The trial judge decided to "de-prejudice" the testimony by his questioning the detective so as to "enlighten the jury as to [the detective's source for the statement]."

Although Morris's counsel objected to the trial court's stratagem, the trial judge proceeded anyway, although agreeing to admonish the detective for his "tendency to give us conclusions rather than facts," which was "making for a difficult administration of this trial." Then, this exchange occurred.

[Trial Judge]: With respect to the last statement you said, just so I understand, in your affidavit you say because all suspects were inside the vehicle at the time of the car stop. It's believed that the article of clothing used during the incident should still be inside the vehicle and the dwelling. And when you seized the items that you just referred to, that was based on the conclusion, plus what Mr. Seleany told Officer Galemore, plus what Mr. Stewart Williams told you, is that correct?

[Det. Conaway]: You have to repeat that sir, I didn't get that one.

[Trial Judge]: Okay. You say in the affidavit; because all suspects were inside the vehicle at the time of the car stop, it's believed that articles of clothing used during the incident could still be inside both the vehicle and the dwelling.

[Det. Conaway]: Right.

[Trial Judge]: And you just testified that you're not executing the warrant looking for items that you believe were associated with the robbery, is that right?

[Det. Conaway]: Yes sir.

[Trial Judge]: Your source of choosing which objects were associated with the robbery was what Mr. Seleany, the victim, told Officer Galemore and what Mr. Stewart Williams told you, is that right?

[Det. Conaway]: Yes sir.

At the conclusion of the trial judge's questioning, Morris's counsel approached the bench, insisting that the trial court "created another very serious problem," by "l[eading] the jury to believe ... that [Seleany and Williams] ... identified these items that were found in the car...." The trial judge disagreed, stating that his questioning clarified *why* the detective took certain items from the white sedan, while leaving others. Moreover, Seleany and Williams, the latter via his taped statement, described previously the items to the jury.

The intermediate appellate court set the foundation, explaining that "[a] relevant extrajudicial statement is generally admissible as non-hearsay 'when it is offered for the purpose of showing that a person relied on and acted upon the statement and is not introduced for the purpose of showing that the facts asserted in the statement are true.'" (Quoting *Graves v. State*, 334 Md. 30, 38, 637 A.2d 1197, 1201 (1994) (citations omitted)). It recognized, however, that extrajudicial statements which explain police conduct, but nonetheless directly implicate the defendants, are excluded typically as overly prejudicial.

The Court of Special Appeals decided that the detective's statement "served the limited purpose of establishing why he seized certain articles of clothing (at least some of which were moved into evidence) during the search" of the white sedan. Moreover, the explanatory statement did not prejudice overly Morris, as "[i]t was undisputed that Williams was in [Morris's] car immediately following the attempted robbery...." Indeed, the presence of a mask, which was identified by witnesses, served to corroborate Morris's testimony. Regarding the trial judge's questioning, the intermediate appellate court concluded that it "clarified for the jury the purpose of the detective's

statement, and was not a departure from his role as an impartial arbiter."

We agree with the Court of Special Appeals's straightforward reasoning that (1) the statement illuminated why the detective collected certain items of potential evidence, and (2) the trial court's questioning, although somewhat confusing, revealed successfully that the detective's statement was not offered for its truth. In particular, the trial court's last question confirmed that the detective's statement was simply detailing the "source[s for] choosing which objects were associated with the robbery."

### B. Limiting Instruction.

Morris claims that the trial judge erred by not instructing the jury that it may consider the taped statement as evidence only against its maker, Williams, but not against Morris. Morris points to Maryland Rule 5–105, which provides that "[w]hen evidence is admitted that is admissible as to one party ... but not admissible as to another party ..., the court, *upon request,* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) Morris concedes, however, that he did not request such an instruction at trial. Nonetheless, he asks this Court to review the issue pursuant to plain error analysis. *See* Md. Rule 4–325(e) (stating that "[a]n appellate court, on its own initiative or on the suggestion of a party, may ... take cognizance of any plain error in the [jury] instructions, material to the right of the defendant, despite a failure to object"). We decline to do so as this matter is quite likely not to re-appear in any new trial.

**JUDGMENT REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY (AS TO MORRIS) AND TO REMAND TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH**

**228**

THIS OPINION; COSTS TO BE PAID BY MAYOR & CITY COUNCIL OF BALTIMORE.

