*Daniel Jay Gross v. State of Maryland*, No. 32, September Term, 2021. Opinion by Biran, J.

**CRIMINAL LAW – HARMLESS ERROR – CUMULATIVENESS –** The Court of Appeals reaffirmed that, when analyzing a trial court's erroneous admission of evidence for harmlessness, the reviewing court's harmless error analysis is governed by the framework established in *Dorsey v. State*, 276 Md. 638 (1976). *Dorsey*'s standard requires the State to show beyond a reasonable doubt that the error in no way influenced the verdict. When reviewing for harmlessness, a court examines the full trial record and, among other things, considers whether the erroneously admitted evidence was cumulative of properly admitted evidence. In this case, the jury heard the victim's account of being abused by Petitioner five times, including once by way of a video of the victim describing the abuse, which was admitted as a prior consistent statement. Upon review of the entire trial record, including evidence introduced by the defense, the Court concluded beyond a reasonable doubt that the admission of the video did not contribute to the rendition of the guilty verdict and, therefore, was harmless.

IN THE COURT OF APPEALS

OF MARYLAND

No. 32

September Term, 2021

DANIEL JAY GROSS

v.

STATE OF MARYLAND

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

Opinion by Biran, J.
Gould and McDonald, JJ., dissent.

Filed: August 26, 2022

*Getty, C.J. and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Art. IV, Section 3A, they also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In 1976, this Court established the standard for harmless error review in Maryland criminal appeals, holding that, "unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed harmless and a reversal is mandated." *Dorsey v. State*, 276 Md. 638, 659 (1976). This standard, so far, has withstood the test of time. The Petitioner in this case, Daniel Jay Gross, asks us to reassess the standard for harmless error review, arguing that we must make the State's burden to establish harmless error more onerous in order to avoid appellate courts usurping the role of the jury as the trier of fact.

In April 2019, in the Circuit Court for Montgomery County, a jury convicted Petitioner of two counts of second-degree sexual offense and one count of sexual abuse of a minor by a household or family member. The victim was Petitioner's adopted daughter. At trial, the victim testified that, when she was in kindergarten and first grade, Petitioner made her perform oral sex on him on multiple occasions. In addition, the victim's biological grandmother testified at trial about the victim's initial disclosure of the abuse to her on June 27, 2015. The State also introduced a video recording of an interview the victim gave to a social worker on June 30, 2015, in which the victim reported the sexual abuse by Petitioner. Further, the State introduced the testimony of a child abuse pediatrician, who provided the jury with the account of the abuse that the victim gave her on July 8, 2015. Before us, Petitioner does not challenge the admission of the victim's account of abuse through the victim's live testimony and these other sources.

However, there was a fifth source of evidence introduced at trial through which the jury heard the victim's allegations of sexual abuse. Over defense objection, the State introduced a video recording of a conversation the victim had with her biological grandmother on June 27, 2015, immediately after she first disclosed the abuse to her grandmother. The victim repeated her allegations of abuse in that recorded conversation. The recording showed the victim crying throughout the conversation with her grandmother, as she begged her grandmother not to put Petitioner in jail. The trial court ruled that the video recording containing the victim's out-of-court statement to her grandmother was admissible as a prior consistent statement.

The Court of Special Appeals held that it was error to admit the video recording of the victim's disclosure to her grandmother, but concluded that the error was harmless beyond a reasonable doubt because the video evidence was cumulative of other evidence through which the jury heard the victim's account of sexual abuse. We agree. As discussed below, we reaffirm that the standard for harmless error analysis in Maryland is whether the reviewing court is convinced, beyond a reasonable doubt, that the error in no way influenced the jury's verdict. We also reaffirm this Court's longstanding approach of considering the cumulative nature of an erroneously admitted piece of evidence when conducting harmless error analysis. After reviewing the complete trial record, we are convinced that the admission of the challenged video was harmless beyond a reasonable doubt. Accordingly, we affirm the judgment of the Court of Special Appeals.

# I

## Background

### A. A.M.'s Adoption and Subsequent Accusations of Abuse

J.M. gave birth to her daughter A.M.[1] in October 2007, when J.M. was 18 years old. J.M. is developmentally disabled. For this reason, J.M.'s mother, C.M., was A.M.'s primary caregiver for approximately the first 18 months of her life. Due to personal difficulties that C.M. was experiencing in approximately 2009, A.M. was placed in foster care at that time. Ultimately, J.M.'s parental rights were terminated, and A.M. was adopted by Petitioner and his wife, Emma Silvia Gross ("Ms. Gross").

A.M. was two years old when she began living with Petitioner, Ms. Gross, and their two minor sons. During the winter of A.M.'s first grade school year, she told a playmate that her father was "ticklish in the nuts." The friend's mother told Ms. Gross what A.M. had said. According to A.M., when Ms. Gross asked her about this statement, she told Ms. Gross (using children's terminology) that she had performed oral sex on Petitioner. After speaking with A.M., Ms. Gross had a conversation with A.M. and Petitioner during which Petitioner denied that he had engaged in oral sex with A.M. According to A.M., she cried and "said he did." Petitioner's denial made A.M. feel "sad" because "he wasn't telling the

---

[1] The victim in this case has had three different legal names during her childhood. We will refer to her as A.M., which are the initials of her current legal name. We will refer to A.M.'s biological mother as J.M. and to A.M.'s biological grandmother as C.M., to protect A.M.'s identity.

truth." After this discussion, an "open door policy" was instituted in the Gross household and Petitioner no longer spent time alone with A.M.

Before this open-door policy was put into effect, A.M. had supervised visits with her biological mother and grandmother (J.M. and C.M.) once or twice a year, and always in a public place. After implementing the open-door policy, Ms. Gross and Petitioner began to allow A.M. to spend more time with J.M. and C.M., including multiple unsupervised weekend stays at C.M.'s home in the spring of 2015. During this time, C.M. consulted an attorney about potentially adopting A.M., with the assistance of Ms. Gross.

On June 27, 2015, while A.M. was spending the weekend at C.M.'s home (where J.M. also lived), A.M. disclosed Petitioner's alleged sexual abuse to C.M. After A.M. told C.M. that she had performed oral sex on Petitioner, C.M. immediately called J.M. from her room and had J.M. record two videos on J.M.'s tablet device in which A.M. repeated her allegations to C.M. In addition to stating that Petitioner made her perform fellatio on him, A.M. said in one of the videos that Petitioner licked "[her] legs, [her] private."

On June 30, 2015, C.M. reported A.M.'s allegations to police.

### B. Investigation and Charges

Later in the evening on June 30, 2015, Britney Colandreo, a social worker employed by Montgomery County Social Services, interviewed A.M. The interview was video recorded. During the interview, among other things, A.M. told Ms. Colandreo that she had sucked Petitioner's "nuts" when he was putting her to bed in her bedroom. Ms. Colandreo did not ask A.M. if Petitioner ever performed cunnilingus on her, nor did A.M. say that Petitioner engaged in that conduct.

4

On July 8, 2015, A.M. met with Dr. Evelyn Shukat, a child abuse pediatrician and the medical director of The Learning Tree Advocacy Center. A.M. told Dr. Shukat that she performed oral sex on Petitioner, and that Petitioner also performed cunnilingus on her.

Police subsequently obtained a warrant to search Petitioner's home. They discovered a stain on the carpet next to A.M.'s bed that they believed might contain bodily fluid. Subsequent testing confirmed the presence of seminal fluid and spermatozoa in the stain, and revealed that the source of the semen had a DNA profile that was consistent with Petitioner's DNA profile.

Petitioner was subsequently charged with one count of sexual abuse of a minor by a household or family member, two counts of second-degree sexual offense (fellatio), and one count of second-degree sexual offense (cunnilingus).

## C. Trial

Shortly before the start of his trial, Petitioner filed a motion *in limine* to preclude the State from introducing the video evidence containing A.M.'s statements to C.M. and J.M. (the "June video"[2]). Defense counsel asserted that the June video was neither admissible as a prior consistent statement nor as a prompt complaint of sexual abuse. The parties and the trial court briefly discussed this motion prior to the start of the evidence. The trial court did not rule on the motion at that time.

---

[2] J.M. made two separate video recordings in quick succession in which A.M. repeated her allegations to C.M. For ease of reference, and similar to how the parties and the Court of Special Appeals have referred to this evidence, we will refer to the two videos collectively as the "June video."

The State's first witness was A.M., who was 11 years old at the time of trial. A.M. testified that Petitioner would "ask me to put my mouth on his man part ... and suck it"; that "white goo" would come out of Petitioner's "man part"; and that these incidents occurred while she was in her bed following bedtime prayers. A.M. also testified that Petitioner would reward these acts by letting A.M. stay up late to play with her toys. According to A.M., the abuse occurred throughout her kindergarten school year and into the winter of first grade. It stopped after she told Ms. Gross that Petitioner "was coming in my room and making me suck his man part." Notably, when asked whether Petitioner "ever [did] anything with his mouth on your body," A.M. answered "No."

The State next called Ms. Gross as a witness. She testified that she heard from a neighbor that A.M. had told the neighbor's daughter that Petitioner was "ticklish in the nuts." According to Ms. Gross, when she asked A.M. about this statement, A.M. said she was kidding. Later, Ms. Gross had a conversation with Petitioner and A.M. in which Petitioner denied having engaged in any sexual acts with A.M. Ms. Gross testified about the "open door policy" that was instituted in the home going forward, and stated that Petitioner subsequently did not spend time alone with A.M. Ms. Gross also acknowledged that, following this incident, she allowed C.M. and J.M. for the first time to have overnight unsupervised visits with A.M., and that she helped C.M. find a lawyer who could advise C.M. regarding possibly adopting A.M.

C.M. then testified. She told the jury that on June 27, 2015, while A.M. was spending the weekend at her home, A.M. told her about Petitioner's sexually abusive acts. According to C.M., she and A.M. were reading together when C.M. asked A.M. whether

6

"your dad and your mom usually do this." At that point, A.M. became "really quiet." Over the objection of defense counsel, C.M. recalled the next part of the conversation:[3]

> And she just you know, say well she say my dad usually is the one who comes you know to my room. I said really. And I was you know, like okay. And she say, yeah, he does. But the only thing that I don't, she say, she say specifically like this, the only thing that I don't like when my dad come to the room is that my dad takes his - at that time, you know, of course, she didn't know what you know, what the private part for a man or woman was called. I don't know. But she didn't say specifically you know the penis. She say, she just, my daddy gets something from his boxer and he make me massage first that and … then she say that he make her, you know, that he put his thing in her mouth and she say that when she said that, that he finish in her mouth and she say that the only thing that I don't like is that something sticky or gooey come from his part. But she say, that's okay, she say you know, he just go to the bathroom and clean himself with paper towel, with paper, you know.

C.M. testified that, after A.M. made these statements to her, she immediately called J.M. from her room and had J.M. make a video of her conversation with A.M.

The State then offered the June video into evidence. Consistent with the motion *in limine* the defense had filed previously, defense counsel objected on the grounds that the video was inadmissible hearsay not subject to the exceptions for a prior consistent statement or a prompt complaint of sexually assaultive behavior. After a lengthy argument outside the presence of the jury, the trial court admitted the June video under the hearsay exception for prior consistent statements. The State then played the June video for the jury. A.M. cried continuously during the recorded conversation. She told C.M. that Petitioner made her "suck his private parts" and that Petitioner licked her "[her] legs, [her] private." A.M. repeatedly implored her grandmother not to tell anyone about Petitioner's conduct,

---

[3] C.M. is not a native English speaker. We quote her statements as they appear in the transcript of Petitioner's trial.

telling C.M.: "I just don't want him to go to jail. I want him to be okay. Just please don't put him in jail. I love him."

Next, the State called Ms. Colandreo to testify regarding her conversation with A.M. on June 30, 2015. Over Petitioner's objection, the State entered the video recording of this interview into evidence and played it for the jury. In that conversation, A.M. told Ms. Colandreo that she sucked Petitioner's "nuts" when he was putting her to bed in her bedroom. She told Ms. Colandreo that this happened "maybe 20" times, and that the last time was in the winter of her first grade year. A.M. also recounted to Ms. Colandreo that Petitioner did not "tell the truth" about what had happened when Petitioner, Ms. Gross, and A.M. talked about it. Ms. Colandreo did not ask A.M. if Petitioner ever performed oral sex on A.M., and A.M. did not mention such conduct in this interview.

The State then called several law enforcement witnesses to establish the facts concerning the discovery and testing of the stain on the carpet next to A.M.'s bed. A crime lab forensic specialist explained that, using an alternate light source, he looked for substances that fluoresce, which indicates that they may contain certain bodily fluids. Using this method, he identified a spot of suspected bodily fluid on the carpet next to A.M.'s bed. He saw no other fluorescing spots in A.M.'s bedroom. The police removed the section of carpet that contained the suspected fluid and submitted it for testing. Crime lab personnel conducted serology testing on a sample taken from the stain and found that it contained seminal fluid and spermatozoa. From that sample, a single-source DNA profile was obtained. The analyst who recovered that profile then compared it with the DNA profile obtained from a buccal sample collected from Petitioner. The two profiles matched.

8

The defense conceded at trial that the carpet stain contained semen, and that Petitioner was the source of that semen.

The State concluded its case-in-chief by calling Dr. Shukat to testify. Over Petitioner's objection, Dr. Shukat explained that she met with A.M. on July 8, 2015. She first interviewed A.M. and then conducted a medical examination. During the interview, A.M. told Dr. Shukat that

> she and her father make deals. And the deals [are] that if, and using her language, if she sucks her father's nuts she'll be able to stay up, and I assume that means stay up later, and watch television. And she described that as oral sex and gooey stuff coming out of his nuts. And one time she said it went in her mouth. As well as her father licks her all over and indicated that she was licked in between her labia of her vagina.

According to Dr. Shukat, A.M. told her that "the gooey stuff went either into toilet paper or a paper towel." The abuse, as reported by A.M. to Dr. Shukat, began in kindergarten. A.M. told Dr. Shukat that Petitioner said "not to tell anybody." According to Dr. Shukat, A.M. told her that she felt what her father did "was disgusting." She also reported to Dr. Shukat that "she felt lonely" and "that she cried at night and she talked to her stuffed animals."

Petitioner called several witnesses in the defense case, including several experts. Dr. Karl Reich testified for the defense as an expert in the fields of forensic DNA and forensic biology. Dr. Reich opined that the semen on the carpet next to A.M.'s bed was transferred inadvertently to that location on the bottom of a sock or other footwear. Dr. Reich also opined that the absence of saliva and a second DNA contributor in the semen found on the carpet did not support A.M.'s allegation of fellatio.

9

The defense also called Dr. Leigh Hagan as an expert in forensic psychology. Dr. Hagen viewed the June video, as well as three other earlier videos made by C.M. in February and March 2015, during which A.M. made statements about how Petitioner and Ms. Gross disciplined her and otherwise discussed her life with the Gross family. The February and March videos contained no allegations of sexual abuse. With respect to the last of the pre-June videos, Dr. Hagan opined that C.M. was "directing the conversation to criticisms of the Grosses, and would ask the child a question, and then the child would answer, and then the grandmother's restatement of what the child said, the grandmother added to it, that is made it worse criticism, and changed the child's words." Dr. Hagan further opined that the videos C.M. made with A.M. (including the June video) were "influential" in terms of "process" and "substance." With respect to process, A.M. "was aware that the video was being made, that this was important to her grandmom to record these things." With respect to "the substance of the conversations that took place across the … videos [from] February to June 27, the grandmom became more assertive, aggressive in her questioning, more directive, and [there was] more of a propensity to change the child's answers in response to what the child had said to the grandmother."

After the defense rested, the State put on a brief rebuttal case, including expert testimony from Jennifer Breaux, the lead forensic scientist in the Forensic Biology Unit of the Montgomery County Police Crime Laboratory. Ms. Breaux testified that if Dr. Reich's transference theory were correct, she would "expect to see more areas of florescence entering in that room, as opposed to one." For Dr. Reich's theory to make sense, Ms. Breaux continued, an individual with "a wet semen stain on the bottom of their shoe" would

10

need to "hop on one foot the entire way in, and then put both feet down, meaning the foot down that has the wet semen stain, then you could just have one stain in there[.]"

In their closing arguments, both the prosecutor and defense counsel directed the jury's attention to the June video.

The prosecutor first quoted portions of A.M.'s trial testimony and her statement to Dr. Shukat and then told the jury:

> She told [Ms. Gross] what the defendant was doing to her. She and [Ms. Gross] then confronted the defendant, and he denied it. She then told [C.M.] six months later. She then told Britney Colandreo from Child Welfare Services. She then told Dr. Evelyn Shukat from The Tree House. And then she came here, and she sat in front of then 14 strangers, and told you exactly what was happening, and she was consistent in each and every one of those disclosures. There's been no variation, there's been no adding elements, none of that, consistent in what she told everybody.

The prosecutor then brought up the June video: "The Defense wants you to believe that this videotaped disclosure by [C.M. and J.M.] was rehearsed, or staged, or whatever word you want to put there. I would submit to you that those disclosures are powerful, and they are heart-wrenching, and they're very different from the other videos that were admitted into evidence. And I encourage you to watch all of them, but I would like to show you the disclosure again." The prosecutor then played the June video for the jury, after which the prosecutor continued: "The Defense wants you to believe that that was staged…. This isn't something that was said to this child to say. This is this child relaying the experience of what happened to her to her grandmother." Later in her closing argument, the prosecutor asked the jurors to watch the video of the interview between A.M. and Ms. Colandreo and

11

suggested that they compare that disclosure "to the disclosure that you just watched," meaning the June video, "and to what [A.M.] told you when she came to court."

In his closing argument, defense counsel first referred to the February and March 2015 videos, which he argued were part of C.M.'s plan to try to adopt A.M. by getting A.M. to say negative things about Petitioner and Ms. Gross. Then, he discussed the June video, which he called "the final production":

> Now comes June 27th, the video in which [A.M.], for the very first time, … 2011, 2012, 2013, 2014, 2015, all in this period of time five years, five and a half years, now suddenly out of the [blue] here is [A.M.] saying he puts his penis in my mouth. Right then and there. Never one reference to anybody, other than [C.M.] at that time….

> And we do know that [C.M.] wanted [A.M.] back. We know that from the videos, and we know that from the evidence. And if you look at the video that the State played for you, we kind of adopt that video as our own to a certain extent, because it comes in the middle of this enormously emotional interchange between [C.M.] and [A.M.] We don't know what was happening before that period of time, what [C.M.] may have said to her.

> You saw her resisting, pushing back, oh, don't put my daddy in jail, he loves me, he had the courage to adopt me. Well, who said anything about jail? Where did the concept of jail come from? She didn't make that comment to Dr. Shukat. She didn't make that comment to Britney Colandreo. What was [C.M.] telling her? Just look at the dynamics how she's shaking and compare that demeanor in that video with what she says when she talks to Britney Colandreo…. Now, we have this June 27th video orchestrated and produced by [C.M.]

> …. This didn't come spontaneously. If that had a been a spontaneous disclosure, [C.M.] would have picked up that phone, on June the 27th, and said, police, get over here right now, because my granddaughter's in jeopardy. She didn't do that. That's not what the evidence shows happened. Where does [C.M.] go? She goes to go in to get a protective order, not on June the 27th, not on the 28th, not on the 29th, but on the 30th, three days later. What happens in that intervening three days? We know one thing that

didn't happen, she never told the commissioner that she had a videotaped interview what [A.M.] purportedly told her.

(Some paragraph breaks omitted.)

Later in his argument, defense counsel returned to the June video, again contrasting it with what A.M. told Ms. Colandreo on June 30, and also noting its similarities to what A.M. told Dr. Shukat on July 8:

> And many of the details that are contained in the June 27th video production by [C.M.] are not said to Colandreo. There's no talk about any ejaculation. There's no talk about anything going in the mouth. There's no talk about any gooey stuff. None of that is said. And compare her demeanor, compare how she's acting when Colandreo's talking to her…. And it's just a completely different person. So, in my mind, I'm asking you to consider what was she exposed to when [C.M.] was talking to her on June the 27th.

> And then nine days later, [A.M.]'s statement to Shukat mimics what [A.M.] said to [C.M.]. And there's no record, no evidence about what happened in those intervening nine days. Who did [A.M.] talk to? Where was she housed? Did she talk to the police? Did somebody confront her with her statements? Did somebody confront her with the video?

In her rebuttal argument, the prosecutor argued that the jury should believe A.M.'s testimony that she told Ms. Gross that Petitioner made her perform oral sex on him. The prosecutor asked rhetorically, why else would Petitioner never again have alone time with A.M. and why else would Ms. Gross and Petitioner "reintroduce [C.M. and J.M.] back into their daughter's life to such an extreme extent if it wasn't exactly true what [A.M.] had told [Ms. Gross]." In the course of making this argument, the prosecutor said that family photos the defense had introduced into evidence showed that A.M. loved Petitioner and "tell you exactly why [A.M.] is telling the truth." The prosecutor then added, "She loved him, and

13

if that raw, powerful heart-wrenching video doesn't convince you of that fact, [the pictures] are another reason[.]"

The jury convicted Petitioner of two counts of second-degree sexual offense based on fellatio and one count of sexual abuse of a minor. The jury acquitted Petitioner of the count charging him with second-degree sexual offense based on cunnilingus. The trial court subsequently sentenced Petitioner to concurrent terms of 17 years in prison, with a mandatory minimum of 15 years of imprisonment, for the two second-degree sexual offense convictions. The trial court also sentenced Petitioner to a consecutive term of 10 years in prison, with all but five years suspended, for sexual abuse of a minor.

### D. Appeal

Petitioner appealed his convictions and sentence to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed Petitioner's convictions but vacated his sentence. *Gross v. State*, No. 1413, Sept. Term, 2019, 2021 WL 1929292 (Md. Ct. Spec. App. May 13, 2021).

The Court of Special Appeals first rejected Petitioner's contention that the trial court erred in admitting A.M.'s out-of-court statements to Ms. Colandreo and Dr. Shukat under Maryland Code, Crim. Proc. ("CP") (2001, 2018 Repl. Vol.) § 11-304.[4] *Id.* at \*4-\*5. The

---

[4] Under CP § 11-304, a trial court in a criminal case may admit an out-of-court statement to prove the truth of the matter asserted in the statement made by a child under the age of 13 who is the alleged victim of child abuse or certain sex offenses. The child must have made the statement to a physician, psychologist, social worker, or another enumerated professional acting lawfully in the course of the person's profession. To be admissible under § 11-304, the statement must not be admissible under any other hearsay exception, and the child victim must testify at trial.

14

Court then held that the trial court erred in admitting the June video, but that the error was harmless. *Id*. The Court agreed with Petitioner that the video contained hearsay evidence that was not subject to the exception for a prior consistent statement under Maryland Rule 5-802.1(b)[5]: "Here, the defense's theory at trial was that [C.M.] coerced [A.M.] into making the accusations against [Petitioner] and that [A.M.]'s motive to fabricate had arisen before [C.M.] made the June 2015 video. Because the charge of fabrication predated [A.M.]'s statements in the June 2015 video, those statements were inadmissible as prior consistent statements." *Id.* at *5. In a footnote, the Court rejected the State's alternative argument that the June video was admissible as a "prompt complaint" of sexual assault under Maryland Rule 5-802.1(d),[6] stating that the Court was not persuaded that "statements [A.M.] made to her Grandmother several months after the abuse ended qualify as prompt." *Id.* at *5 n.5.

However, the Court of Special Appeals concluded that the error was harmless beyond a reasonable doubt. *Id.* at *6. The Court reasoned that, by the time the June video was admitted in Petitioner's trial,

> [A.M.] had testified both on direct and cross that she told her Grandmother that [Petitioner] had abused her. In fact, during her direct testimony, [A.M.] stated specifically that she told her Grandmother that [Petitioner] wanted her "to suck his man part." When the June 2015 video was admitted, the jury had

---

[5] Under Maryland Rule 5-802.1(b), a trial witness's prior out-of-court statement is not excluded as inadmissible hearsay if it "is consistent with the declarant's testimony, [and] if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive."

[6] Maryland Rule 5-802.1(d) provides an exception to the hearsay rule for a "statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony."

15

been exposed to the substance of the statements contained in the video. Moreover, the point that the statements tended to prove – that [Petitioner] made [A.M.] perform oral sex on him – was well-established by other evidence presented at trial, most notably [A.M.]'s testimony, her statements to Ms. Colandreo and Dr. Shukat, and the DNA evidence linking [Petitioner] to the semen stain found near [A.M.]'s bed. The marginal cumulative impact of admitting [A.M.]'s statements to her Grandmother in the June 2015 video was negligible, and the error harmless.

*Id.*

The Court of Special Appeals also rejected Petitioner's arguments based on alleged errors in the *voir dire* process, *id.* at \*8-\*9, and on the trial court's denial of his motion to suppress evidence. *Id.* at \*11-\*12. However, the Court agreed with Petitioner's claim of error involving the two mandatory minimum sentences imposed for the second-degree sexual offense convictions. *Id.* at \*9. Accordingly, the Court vacated Petitioner's sentences and ordered a remand for resentencing. *Id*.

Petitioner sought further review in this Court, challenging the Court of Special Appeals' ruling that the admission of the June video was harmless beyond a reasonable doubt. The State filed a conditional cross-petition concerning the intermediate appellate court's determination that the "prompt complaint" hearsay exception was inapplicable to A.M.'s statements to C.M. in the June video. On September 13, 2021, we granted both parties' petitions. *Gross v. State*, 476 Md. 237 (2021).

Rephrased based on Petitioner's briefing, the questions he asks us to resolve are:[7]

1. To meet its burden to show that an error was harmless beyond a reasonable doubt, must the State establish that, in addition to the erroneously admitted evidence, there was "other overwhelming and largely uncontroverted evidence properly before the trier of fact"?

2. When an out-of-court statement is erroneously admitted as a prior consistent statement, should a court conducting harmless error review consider whether the information contained in the prior statement is cumulative of other properly admitted evidence?

3. Based on a review of the full trial record, including evidence adduced by Petitioner in the defense case, was the admission of the June video harmless beyond a reasonable doubt?

---

[7] In his petition for *certiorari*, Petitioner asked us to decide:

I. Under *Dorsey v. State*, 276 Md. 638 (1976), did the Court of Special Appeals err when it:

a. reviewed for harmless error and only analyzed the evidence put forth by the state when the petitioner controverted the evidence at the trial through multiple witnesses, including experts?

b. analyzed an improperly admitted prior consistent statement for its cumulativeness since, although prior consistent statements are cumulative, it is their consistency that is the very nature of the harm?

Petitioner also included a second question challenging the Court of Special Appeals' determination that the trial court properly admitted the testimony of Ms. Colandreo and Dr. Shukat under CP § 11-304. When we issued the writ of *certiorari*, we agreed to take up that question as well as the questions concerning harmless error relating to the June video. However, in his opening brief, Petitioner informed us that he was withdrawing his claim of error concerning the admission of Ms. Colandreo's and Dr. Shukat's testimony. As such, Petitioner has waived further review of that issue, and we assume for purposes of this opinion that the trial court properly admitted Ms. Colandreo's and Dr. Shukat's testimony.

In its cross-petition, the State asks us to decide this question:

1. Did the Court of Special Appeals wrongly conclude the June 2015 video was not admissible under the prompt complaint exception to the hearsay rule?[8]

## II

## Standard of Review

In his briefing, Petitioner asks us to reassess the standard for harmless error review in Maryland criminal cases. What the correct standard for harmless error review should be is a question of law that we review *de novo*. *See, e.g.*, *State v. Robertson*, 463 Md. 342, 358 (2019).

When an appellate court considers the State's argument that an error is harmless, the court conducts "its own independent review of the record." *Dorsey v. State*, 276 Md. 638, 659 (1976). Thus, we consider whether an error is harmless beyond a reasonable doubt without deference to the Court of Special Appeals' prior determination of that question.

## III

## Discussion

Petitioner argues that Maryland appellate courts have allowed the harmless error standard to become, in essence, a toothless tiger. According to Petitioner, this Court has long overlooked language in *Younie v. State*, 272 Md. 233 (1974), that makes the State's burden to prove harmlessness more difficult to meet. Petitioner asks us to recognize *Younie*

---

[8] Because the State has not asked us to review the Court of Special Appeals' determination that the June video did not qualify as a prior consistent statement under Maryland Rule 5-802.1(b), we assume that it was error to admit the June video under that hearsay exception.

as stating the standard for harmless error review in Maryland, and hold that the State must establish that, in addition to the erroneously admitted evidence, there was other overwhelming and largely uncontroverted evidence properly before the trier of fact. Petitioner contends that without the heightened burden purportedly set forth in *Younie*, harmless error review frequently leads appellate courts to usurp the jury's role as the trier of fact. Further, Petitioner asserts that the current regime of harmless error review encourages prosecutors to knowingly seek the admission of inadmissible evidence because they can be confident that any error in admitting the evidence will be deemed harmless on appeal.

In addition, Petitioner argues that, in considering the harmfulness of evidence that was erroneously admitted as a prior consistent statement, a reviewing court should not deem the evidence's cumulativeness to be a factor in favor of determining that the error was harmless. According to Petitioner, it is the very cumulativeness of a prior consistent statement that makes the erroneous admission of such a statement harmful.

Finally, Petitioner contends that the application of the correct standard for harmless error review, including consideration of the evidence he offered to contradict the State's proof, compels the conclusion that the admission of the June video was not harmless beyond a reasonable doubt.

The State, in contrast, argues that *Dorsey* has been and should remain the lodestar for harmless error analysis in Maryland, and that *Younie* did not establish a different standard than that which has been applied by Maryland appellate courts for almost 50 years since this Court decided *Dorsey*. The State contends that cumulativeness is always a valid

consideration in harmless error analysis, and that in this case, A.M.'s statements in the June video were cumulative of information the jury received several other times through properly admitted evidence. The State concludes that, reviewing the trial record in full, the admission of the June video was harmless beyond a reasonable doubt. We agree with the State on all of these points.[9]

**A.** *Dorsey* **Provides the Standard for Harmless Error Review in Maryland.**

Petitioner argues that harmless error analysis in Maryland is, or should be, governed by language in this Court's 1974 decision in *Younie v. State* that, according to Petitioner, imposes a higher burden on the State to prove harmlessness than this Court has required in the half century that has since passed. We disagree. The standard this Court announced in 1976 in *Dorsey* remains the foundation of harmless error review in Maryland and is fully consistent with *Younie*. We reaffirm the *Dorsey* standard today.

In *Dorsey*, this Court carefully considered, and formally adopted, the harmless-beyond-a-reasonable-doubt standard for harmless error review in Maryland. The Court derived this standard from the Supreme Court's standard for harmless error review of constitutional errors in *Chapman v. California*, 386 U.S. 18 (1967), as well as its own prior cases, including the then-recent case of *Younie v. State*. *See Dorsey*, 276 Md. at 657-59. Unlike the Supreme Court, this Court decided to apply the harmless-beyond-a-reasonable-doubt standard to all trial errors, not just constitutional errors. *See id.* at 659.

---

[9] Because we conclude that the admission of the June video was harmless beyond a reasonable doubt, we do not reach the State's alternative argument that the June video was admissible as a prompt complaint of sexually assaultive behavior.

The *Dorsey* Court described the test it was adopting as follows:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed harmless and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.

*Id.* (quotations omitted).

Petitioner notes the *Dorsey* Court's reference to *Younie* and calls attention to a particular passage in *Younie* that he claims is part of, or should be added to, the *Dorsey* standard for harmless error. *Younie* involved the erroneous admission of a pretrial statement in which the defendant exercised his right under the Fifth Amendment not to answer certain questions. 272 Md. at 236-38. After analyzing *Chapman v. California* and other Supreme Court cases, the Court in *Younie* distilled from them the standard of harmlessness review that applies to constitutional errors:

> What is of importance, from an examination of the cases which discuss harmless error, is the realization that if the error goes to a substantial constitutional right (*e.g.* … right not to self-incriminate – fifth amendment) then unless the State can prove beyond a reasonable doubt, as the prosecution did in *Milton v. Wainwright*, 407 U.S. 371, 92 S. Ct. 2174, 22 L.Ed.2d 1 (1972) (where an invalid confession accompanied three valid ones and other substantial evidence of guilt), that a tainted confession in no way influenced the verdict such that the defendant would undoubtedly have been found guilty even if that evidence had not been received, its employment will always be error. *Conversely, if the State can show beyond a reasonable doubt that the violation was technical in nature, as well as that the erroneously admitted evidence was merely cumulative, and that there was other overwhelming and largely uncontroverted evidence properly before the trier of fact, then the error would be harmless.*

*Id.* at 246-47 (emphasis adjusted). The passage we have italicized above contains the language that Petitioner argues is, or should be, a required part of the State's showing of harmlessness.

We do not believe that the *Younie* Court intended the italicized language to describe the State's burden in every case where it seeks to establish that an error is harmless. After stating the federal standard as described in *Chapman* and other cases, the *Younie* Court went on to say that "*if* the state can show beyond a reasonable doubt that the violation was technical in nature, as well as that the erroneously admitted evidence was merely cumulative, and that there was other overwhelming and largely uncontroverted evidence properly before the trier of fact, then the error *would* be harmless." *Id*. (emphasis added). The Court included this language to articulate and particularize some of the relevant considerations that a reviewing court should take into account and to provide an example in which an error would clearly be deemed harmless. As we read this passage in *Younie*, the Court did not establish a series of necessary prerequisites to a finding of harmlessness or an independent test that the State must meet in order to prevail.

In the part of the opinion in which the Court decided the case before it, the *Younie* Court concluded that the "error committed ... was not harmless beyond a reasonable doubt" because "the good evidence standing alone must be sufficient to convict" and the Court was not "convinced beyond a reasonable doubt that the jury was in no way influenced by the" erroneously admitted "bad" evidence. *Id.* at 248-49. The Court did not reference its earlier example regarding "overwhelming and largely uncontroverted evidence." That is, the Court did not indicate that the State failed to show the error was harmless because it

did not establish that there was "overwhelming and largely uncontroverted evidence properly before the trier of fact."

In *Dorsey*, this Court cited *Younie*, including the language italicized above, in describing the case. *See Dorsey*, 276 Md. at 655-56. But when it came time to state the harmless error standard that would apply to all errors in Maryland, the *Dorsey* Court, while again mentioning *Younie*, did not repeat the language from *Younie* that Petitioner deems critical. *See id.* at 659. Rather, the Court held that "unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Id.* Putting it another way, the Court continued: "Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict." *Id.* It is telling that neither of these formulations included the language from *Younie* that Petitioner highlights.

Also telling is the absence of that part of *Younie* from all Maryland appellate cases that have described the harmless error standard ever since *Dorsey* was decided. This Court and the Court of Special Appeals have repeatedly cited *Dorsey* and its formulations of the harmless error standard. *See, e.g.*, *State v. Miller*, 475 Md 263, 302 (2021) (holding that there was "no reasonable possibility that [the error] may have contributed to the rendition of the guilty verdict" and citing to *Dorsey*) (internal quotation marks omitted); *Taylor v. State*, 473 Md. 205, 235, 238 (2021) (citing to *Dorsey*'s harmless error standard and holding that the "record does not establish beyond a reasonable doubt that the erroneous

instruction had no influence on the verdict"); *Paydar v. State*, 243 Md. App. 441, 457-58 (2019) (citing *Dorsey* for the proposition that "[i]n a criminal case, an error by a trial court is harmless only when a reviewing court is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict") (quotations removed); *Cox v. State*, 51 Md. App. 271, 284 (1982) (citing to *Dorsey* extensively and concluding: "Applying the clear dictates of the harmless error test established in this State, upon our own independent review of the record we cannot declare a belief, beyond a reasonable doubt, that the error here in no way influenced the verdict.").[10] While we have occasionally used additional language to flesh out the *Dorsey* standard without changing its fundamental meaning, *see, e.g.*, *Bellamy v. State*, 403 Md. 308, 332-33 (2008) ("To say that an error did not contribute to the verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.") (internal quotation marks and citations omitted), we have never cited *Younie* for the proposition that the State must show that "other overwhelming and largely uncontroverted evidence" supports the guilty verdict to meet its burden to establish harmlessness.

Nor do we perceive any reason to incorporate that language from *Younie* into the standard for harmless error at this time. We disagree with Petitioner's contention that the *Dorsey* standard is not sufficiently rigorous. The cases are legion in which this Court and the Court of Special Appeals, after applying the *Dorsey* standard, have held errors not to be harmless beyond a reasonable doubt. *See, e.g.*, *Taylor*, 473 Md. at 238; *Williams v. State*,

---

[10] This Court and the Court of Special Appeals have cited *Dorsey* more than 800 times.

24

462 Md. 335, 354-59 (2019); *State v. Simms*, 420 Md. 705, 738-40 (2011); *Dove v. State*, 415 Md. 727, 750-52 (2010); *Hutchinson v. State*, 406 Md. 219, 227-29 (2008); *Paydar*, 243 Md. App. at 463-64; *Cox*, 51 Md. App. at 284. Prosecutors who convince trial courts to admit what the prosecutors know to be inadmissible evidence, or to take some other action that is likely to be found to be erroneous on appeal, do so at their peril. Retrials are very likely to be part of their future.

That said, we take issue with Petitioner's characterization of the State's introduction of the June video as "prosecutorial misconduct." The State made its argument to the trial court, which agreed that the June video was admissible. The Court of Special Appeals disagreed. This is not an instance of a prosecutor withholding exculpatory evidence or otherwise acting unethically. Given the time constraints under which trial judges must make evidentiary rulings, those determinations are often very challenging, even for the most experienced trial judges. Not surprisingly, then, such matters are often also unclear to prosecutors and defense counsel. The inadmissibility of the June video, either as a prior consistent statement or as a prompt complaint of sexually assaultive behavior, was far from obvious.[11]

Prosecutors do not know for sure which pieces of evidence a jury will find compelling and which items they will discount. And prosecutors (as well as trial judges) lack a crystal ball that tells them what an appellate court subsequently will find to have

---

[11] As noted above, we assume for purposes of the opinion that the June video was not properly admissible as a prior consistent statement. We do not make any assumption about its status as a "prompt complaint."

been admitted erroneously. With the benefit of hindsight, it is tempting to say that a prosecutor should have known that they had enough evidence to convict without introducing a piece of evidence that they also should have known would be deemed inadmissible by an appellate court. In the real world of trials, these matters are seldom clear. The *Dorsey* standard safeguards a defendant's right to a fair trial – not a perfect trial[12] – while at the same time allowing prosecutors appropriate leeway to make legitimate arguments.

We also reject Petitioner's argument that we must embrace the *Younie* language to ensure that Maryland appellate courts do not usurp the role of the jury. According to Petitioner, "[i]t is impossible to recreate the atmosphere of a trial at the appellate level. Appellate judges, nor appellate lawyers, can compare their knowledge to that of the commonsense experience of twelve members of the community." To be sure, reading the cold record of a trial through its transcripts does not replicate the jury's experience in seeing and hearing the witnesses live. For this reason, we do not make credibility determinations when conducting harmless error analysis or any other form of appellate review. However, we do not need to make credibility determinations to decide whether a defendant received a fair trial. Appellate courts around the country conduct harmless error analyses every day, applying the same standard that we use under *Dorsey*. Contrary to Petitioner's claim, application of this standard does not "invade[] … an accused's right to a trial by a jury."

---

[12] *See Dorsey*, 276 Md. at 647 (noting that "it is firmly established that an accused has a constitutional right to a fair trial but not necessarily to that seldom experienced rarity, a perfect trial") (cleaned up).

In 2008, this Court stated that *Dorsey*'s standard for harmless error "remains unchanged today." *Hutchinson*, 406 Md. at 227. We reaffirm the *Dorsey* standard once again today and reiterate that, in order to establish that an error was harmless, the State must show beyond a reasonable doubt that the "evidence admitted in error in no way influenced the verdict." *Dorsey*, 276 Md. at 659. No more, no less.[13]

## B. Evidentiary Cumulativeness Is a Relevant Factor in Harmless Error Analysis.

The cumulative nature of erroneously admitted evidence has long been recognized as an important factor in considering whether, beyond a reasonable doubt, the trial error at issue in no way influenced the verdict. Indeed, in *Dorsey*, this Court described several post-*Chapman* Supreme Court harmless error cases as recognizing cumulativeness as one of two bases for concluding that an error was harmless beyond a reasonable doubt:

> In *Harrington v. California*, 395 U.S. 250 (1969), *Schneble v. Florida*, 405 U.S. 427 (1972), *Milton v. Wainwright*, 407 U.S. 371 (1972) and *Brown v. United States*, 411 U.S. 223 (1973), the Supreme Court invoked the *Chapman* test in finding "harmless error." In each of these cases, that Court, upon an independent review of the record, found the properly admitted evidence to have been "so overwhelming," and the prejudicial effect of the erroneously admitted evidence so insignificant by comparison, *or to have been cumulative*, that it was able to conclude, beyond a reasonable doubt, that the erroneously admitted evidence – even though of constitutional import – constituted "harmless error."

---

[13] Petitioner points us to no other jurisdictions that have made the State's burden on harmless error review more onerous than *Dorsey* currently requires. Our own research reveals that Maryland is not an outlier in maintaining this standard of harmless error review. Rather, the *Chapman* standard (which is equivalent to the *Dorsey* standard) is seemingly the standard around the country with respect to constitutional errors. *See* Daniel Epps, *Harmless Errors and Substantial Rights*, 131 HARV. L. REV. 2117, 2133-42 (2018). Maryland has gone farther than the federal courts by applying the beyond-a-reasonable-doubt standard to non-constitutional errors. We decline to make Maryland an outlier by adopting an even more rigorous standard for harmless error review.

*Dorsey*, 276 Md. at 649 (emphasis added). In *Dorsey* itself, the Court held that the trial court's error in allowing a detective to testify to his record in obtaining convictions following arrests was not harmless, among other reasons, because it "was certainly not cumulative." 276 Md. at 659 (internal quotation marks and citations omitted).

Since *Dorsey* was decided, cumulativeness has remained an important analytical consideration in this Court's harmless error analysis. *See, e.g.*, *Dove*, 415 Md. at 743-44 (noting that "[i]n considering whether an error was harmless, we also consider whether the evidence presented in error was cumulative evidence.... [C]umulative evidence tends to prove the same point as other evidence presented during the trial or sentencing hearing. For example, witness testimony is cumulative when it repeats the testimony of other witnesses[.]"); *see also Simms*, 420 Md. at 739-40; *Morris v. State*, 418 Md. 194, 221-22 (2011); *Yates v. State*, 429 Md. 112, 119-124 (2012); *Hutchinson*, 406 Md. at 227-28.

In *Hutchinson*, a rape prosecution, a nurse gave an expert opinion about the complaining witness's injuries; the State had failed to provide the required discovery concerning such expert testimony to the defense. 406 Md. at 225. This Court held that the error in admitting the expert testimony was not harmless because it was "not merely cumulative" as argued by the State. *Id.* at 227-28. As the nurse was the only examiner of the victim's injuries and was the only witness who testified that the victim's injuries were consistent with forced intercourse, we concluded that "[the nurse's] testimony may well have been given significant weight" by the jury. *Id.*

In *Dove*, we held that information regarding the defendant that was only available on an inadmissible fingerprint card (his weight, height, and other identifying

28

characteristics, as well as direct linkage to a prior conviction) was not cumulative, as much of this information was not present in any other properly admitted evidence. 415 Md. at 749-51. We also recognized that, in its sentencing of the defendant, the trial court explicitly stated that it had relied on the fingerprint card. *Id.* at 749-50. Because the court explicitly relied on this erroneously admitted, prejudicial, and non-cumulative evidence, the error was not harmless beyond a reasonable doubt. *Id.* at 749-51.

In *Simms*, the Court also considered whether the cumulative nature of erroneous evidence can contribute to a finding that the error was harmless. 420 Md. at 739-40. In that case, the evidence admitted in error was an alibi notice. The defendant ultimately chose not to pursue an alibi defense. *Id.* at 738. The State used this alibi notice to build inferences of circumstantial "consciousness of guilt." *Id.* at 739. While the State presented additional and separate evidence contributing to the overall inference of consciousness of guilt, the Court reasoned that the alibi notice was non-cumulative and presented unique information in the trial. *Id.* at 739-40. As such, its admission constituted harmful, reversible error. *Id.* at 740 ("In this case, we cannot say that the alibi notice was sufficiently cumulative so as to not impact the jury.").

In *Morris*, this Court again employed *Dove*'s articulation of an error's cumulative nature as an important consideration in the Court's overarching harmfulness analysis. 418 Md. at 221-22. In that case, the evidence at issue was a taped statement by a co-defendant that violated the defendant's right to confrontation. However, part of the statement was cumulative, as it was duplicative of testimony offered by officers who also testified. *Id.* at 222. That being the case, we "consider[ed] it no further in our harm analysis." *Id.* We cited

*Dove* for the proposition that "'cumulative evidence,' which 'tends to prove the same point as other evidence presented during the trial or sentencing hearing,' may render harmless otherwise reversible error." *Id.* (quoting *Dove*, 415 Md. at 743-44).

However, we determined that the other, non-cumulative information in the erroneously admitted statement was harmful because it was potentially misleading as to the defendant's whereabouts at the time of the crime. *Id.* at 223. Where the case hinged on a defendant's "unwitting participant" defense, the non-cumulative, erroneously admitted evidence regarding the defendant's location likely affected the jury verdict. *Id.* Therefore, we could not find the error to be harmless. *Id.* at 223-24.

In *Yates*, a felony-murder case, the defendant (Yates) allegedly chased and shot at a man (Kohler) who had tried to cheat him in a drug deal. 429 Md. at 117. The bullet struck and fatally wounded an innocent bystander. *Id.* Yates and Kohler were tried together for their roles in the drug transaction and shooting. *Id.* Two of Yates's associates (Jagd and Griffin) testified that they saw Yates fire the weapon and that Yates admitted to them that he fired at Kohler, but said that he was not sure if had hit Kohler or anyone else. *See id.* In addition, a detective testified (over Yates's objection) that Jagd said in a pretrial statement that Yates had told Jagd he had "popped that n---a," meaning Kohler. *See id.* at 117-18.

The State conceded that the double hearsay statement that was elicited through the detective should not have been admitted. *See id.* at 119 & n.1. However, this Court held that the error in admitting this testimony was harmless beyond a reasonable doubt because the detective's testimony was cumulative of the trial testimony of Jagd and Griffin. *Id.* at 122-23. In this regard, we rejected Yates's argument that the detective's testimony was

harmful because the associates' testimony was "not of the same quality as the statement relayed by [the detective]." *Id.* at 122-23. Yates claimed that "his supposed admission to Jagd that he 'popped that [n---a]' was 'far more powerful' than the other statements admitted at trial because the statement was callous and made it seem as if [Yates] had 'coolly bragged' about the crime." *Id.*

We rejected Yates's contention that "it is not merely the content but also the manner in which that content is delivered that matters to whether the evidence is cumulative." *Id.* at 122-23. Thus, it was immaterial to the Court's analysis that a "boastful, unambiguous statement that [Yates] 'popped' someone … would have more of an impact on the jury than [Yates's] statements that he was unsure if he hit anyone." *See id.* at 123. As we explained:

> The substance of [the detective's] statement is that [Yates] told Jagd that he fired a gun and shot someone. Jagd separately testified that [Yates] said "I don't know if I got him" or "I think I got him," even while he denied (to some extent) making the provocative statement to [the detective]. In addition, Jagd testified that he saw [Yates] run out of the house with a gun and saw [Yates] discharge it. Griffin testified similarly that [Yates] fired the gun and said to Griffin that he, [Yates], was not sure if he hit anyone. These statements, although using different words, reach the same conclusion: that [Yates] fired a gun shortly after chasing Kohler out of the house.
>
> [Yates] places too great an emphasis on the fact that the challenged hearsay statement came through [the detective]. It is conceivable that the jury found [the detective] more credible than Jagd and concluded that [the detective] correctly recalled what Jagd had said. But in order to convict [Yates], the jury would have had to believe not only that [the detective] was correct in remembering Jagd's statement to him, but that Jagd himself was credible in relating to the detective what [Yates] told him. For the jury to believe that the statement was credible it would need to believe both [the detective] *and* Jagd. Ultimately, though, the jury would had to have focused on the credibility of Jagd and Griffin in connection with their statements implicating [Yates]. There were three such statements: two from Jagd (one relayed through [the detective]) and one from Griffin. Jagd testified that [Yates] ran out of the house with a gun and fired in the direction of Kohler. Both Jagd

31

> and Griffin testified that [Yates] admitted that he fired his gun and thought he hit something or was unsure if he hit something…. [T]his testimony establishes the "essential contents" of the hearsay from Jagd that [the detective] repeated to the jury.

*Id.* at 123-24 (citation omitted). We concluded that "the admission of the hearsay evidence did not ultimately affect the jury's verdict given the cumulative nature of the similar statements offered at trial." *Id.* at 124.

We perceive no reason why the cumulativeness of a prior statement would be irrelevant to the harmlessness analysis when the statement was admitted erroneously as a prior consistent statement. The point of the harmless error inquiry is to determine whether the erroneously admitted evidence could have influenced the verdict. In some instances, a reviewing court will not be able to rule out the possibility that hearsay erroneously admitted as a prior consistent statement influenced the verdict. *See, e.g.*, *Thomas v. State*, 429 Md. 85, 111 (2012) (erroneous admission of trial witness's prior statement to police as a prior consistent statement was not harmless where the "State's case depend[ed] virtually exclusively on the credibility of [the] witness") (internal quotation marks and citations omitted); *Newman v. State*, 65 Md. App. 85, 97-98 (1985) (statement of complainant to her mother's friend was erroneously admitted as a prior consistent statement; Court of Special Appeals held the error was not harmless because portions of the statement were not merely cumulative of the complainant's trial testimony, but also included allegations of other uncharged criminal acts and of the defendant's bad character; in addition, because the case depended "exclusively on the victim's credibility," the statement to the friend's mother bolstered the complainant's testimony and was not harmless); *see also Muhammad v. State*,

32

223 Md. App. 255, 272-73 (2015); *McCray v. State*, 122 Md. App. 598, 610-11 (1998). In other instances, a reviewing court will be able to conclude beyond a reasonable doubt that the information contained in the erroneously admitted statement did not influence the verdict because the jury heard the same information from multiple other sources. As discussed below, that was the case here.

**C. The Admission of the June Video Was Harmless Beyond a Reasonable Doubt.**

Based on our review of the full trial record,[14] we conclude beyond a reasonable doubt that the admission of the June video was harmless. We have no doubt that, had the trial court excluded the June video, the verdict would have been the same.

We reach this conclusion because, with respect to the allegations that Petitioner made A.M. perform oral sex on him, the substance of A.M.'s statements to C.M. in the June video is materially indistinguishable from the evidence the jury heard from other sources and that Petitioner does not challenge before us. First, the jury heard A.M.'s live testimony in which she described how, during her kindergarten and first grade years, Petitioner asked her "to put [her] mouth on his man part ... and suck it"; that "white goo" would come out of Petitioner's "man part"; and that these sex acts occurred while she was in her bed following bedtime prayers.

Second, the jury heard from C.M. that, prior to recording A.M. on June 27, 2015, A.M. told C.M. that "my daddy gets something from his boxer and he make me massage first that and … he make her … put his thing in her mouth" and "she say that … he finish

---

[14] We agree with Petitioner that harmless error analysis requires the reviewing court to consider the full trial record, including evidence adduced in the defense case.

33

in her mouth and … that the only thing that I don't like is that something sticky or gooey come from his part. But she say, that's okay, … he just go to the bathroom and clean himself with paper towel, with paper[.]"[15]

Third, the State introduced the video recording of Ms. Colandreo's interview of A.M. on June 30, 2015, in which A.M. stated that she sucked Petitioner's "nuts" when he was putting her to bed in her bedroom. She told Ms. Colandreo that this happened "maybe 20" times, and that the last time was in the winter of her first-grade year. A.M. also told Ms. Colandreo that Petitioner did not "tell the truth" about what had happened when Petitioner, Ms. Gross, and A.M. talked about it, which also mirrored A.M.'s testimony at trial.

Fourth, Dr. Shukat recounted her interview of A.M. on July 8, 2015, in which A.M. told Dr. Shukat that "she and her father make deals. And the deals [are] that if, and using her language, if she sucks her father's nuts she'll be able to stay up, and I assume that means stay up later, and watch television." Dr. Shukat explained that A.M. "described that as oral sex and gooey stuff coming out of his nuts. And one time she said it went in her

---

[15] When the State began questioning C.M. about her pre-video conversation with A.M., Petitioner's counsel objected on the grounds that A.M.'s statements were not "spontaneous" or "prompt." The trial court overruled the objection. As stated above, Petitioner does not challenge the admission of C.M.'s testimony about A.M.'s pre-video statements in this appeal.

mouth." A.M. told Dr. Shukat that "the gooey stuff went either into toilet paper or a paper towel." A.M. also told Dr. Shukat that the abuse began in kindergarten.[16]

Thus, separate and apart from the June video, the jury heard several times over that A.M. performed oral sex repeatedly on Petitioner during her kindergarten and first-grade years. A.M.'s statements to C.M. in the June video describing the oral sex were cumulative of all of this evidence that Petitioner does not challenge before us.

In addition, the DNA evidence introduced at trial was devastating to Petitioner. He conceded that he was the source of the semen found on the carpet next to A.M.'s bed. The presence of one spot of seminal fluid on the carpet corroborated A.M.'s live testimony and her earlier statements to Ms. Colandreo and Dr. Shukat. The jury easily could infer that, on one occasion, Petitioner failed to ensure that his ejaculate went completely "either into toilet paper or a paper towel." It is not surprising that the jury rejected Dr. Reich's transference theory, given that there were no other fluorescing spots discovered in A.M.'s bedroom.

This case, thus, differs from *Thomas*, *Newman*, and other cases in which a trial court erroneously admitted an out-of-court statement as a prior consistent statement when the entire case hinged on the credibility of a witness's trial testimony. In those cases, the erroneously admitted statement provided the only corroboration of the witness's live testimony. *See, e.g.*, *Thomas*, 429 Md. at 111; *Newman*, 65 Md. App. at 97-98. Here, in

---

[16] As discussed above, Petitioner objected at trial to the admission of A.M.'s statements to Ms. Colandreo and Dr. Shukat, and maintained that position in the Court of Special Appeals. However, Petitioner abandoned that claim of error before us.

addition to the June video, the State introduced the two other prior statements that A.M. made to Ms. Colandreo and Dr. Shukat, as well as the DNA evidence, all of which corroborated A.M.'s trial testimony. It is true that the June video differed from the video of Ms. Colandreo's interview in that A.M. cried throughout the former and was composed during the latter. However, as this Court explained in *Yates*, 429 Md. at 122-24, it is the substance of the erroneously admitted statement, not its different manner of delivery compared with the properly admitted evidence, that matters in the cumulativeness analysis.[17]

Also relevant is the defense's affirmative use of the June video. The June video provided a tangible reference point for the defense to use in suggesting to the jury that C.M. manipulated A.M. into making false allegations against Petitioner. Indeed, defense counsel told the jury during his closing argument that "we kind of adopt that video as our own to a certain extent, because it comes in the middle of this enormously emotional interchange between [C.M.] and [A.M.]." The video allowed defense counsel to show C.M. directing the conversation with A.M. as C.M. saw fit. Using the testimony of Petitioner's expert, Dr. Hagan, defense counsel walked the jury through the pre-June videos, which the defense

---

[17] In his Reply Brief, Petitioner inaccurately states: "The direct testimony of A.M. was on April 2, [Dr.] Shukat's testimony about what A.M. told her was on April 9, and finally, the June 2015 video evidence was introduced on April 10." The June video was introduced during C.M.'s direct examination on April 2, 2019, shortly after A.M. concluded her testimony that day. That was before the jury saw the video recording of Ms. Colandreo's interview of A.M. and before Dr. Shukat testified about her interview of A.M. Thus, Petitioner is incorrect when he claims that, until the June video was played, "the jury only had heard the relatively dry trial testimony of A.M. followed by what a bunch of other people said A.M. said."

claimed C.M. made to facilitate adopting A.M., and then discussed the June video at length,

calling it "the final production."

Defense counsel also used the date of the June video – June 27, 2015 – as a reference

point by which the jury should assess the events that came afterwards:

> You saw [A.M.] resisting, pushing back, oh, don't put my daddy in jail, he loves me, he had the courage to adopt me. Well, who said anything about jail? Where did the concept of jail come from? She didn't make that comment to Dr. Shukat. She didn't make that comment to Britney Colandreo. What was [C.M.] telling her? Just look at the dynamics how she's shaking and compare that demeanor in that video with what she says when she talks to Britney Colandreo…. Now, we have this June 27th video orchestrated and produced by [C.M.]
>
> …. This didn't come spontaneously. If that had a been a spontaneous disclosure, [C.M.] would have picked up that phone, on June the 27th, and said, police, get over here right now, because my granddaughter's in jeopardy. She didn't do that. That's not what the evidence shows happened. Where does [C.M.] go? She goes to go in to get a protective order, not on June the 27th, not on the 28th, not on the 29th, but on the 30th, three days later. What happens in that intervening three days? We know one thing that didn't happen, she never told the commissioner that she had a videotaped interview what [A.M.] purportedly told her.

(Some paragraph breaks omitted.)

Later in his argument, defense counsel returned to the June video, again contrasting

it with what A.M. told Ms. Colandreo on June 30, and also noting its similarities to what

A.M. told Dr. Shukat on July 8:

> And many of the details that are contained in the June 27th video production by [C.M.] are not said to Colandreo. There's no talk about any ejaculation. There's no talk about anything going in the mouth. There's no talk about any gooey stuff. None of that is said. And compare her demeanor, compare how she's acting when Colandreo's talking to her…. And it's just a completely different person. So, in my mind, I'm asking you to consider what was she exposed to when [C.M.] was talking to her on June the 27th.

And then nine days later, [A.M.]'s statement to Shukat mimics what [A.M.] said to [C.M.]. And there's no record, no evidence about what happened in those intervening nine days. Who did [A.M.] talk to? Where was she housed? Did she talk to the police? Did somebody confront her with her statements? Did somebody confront her with the video?

Before us, Petitioner argues that the June video was "inflammatory," "highly charged hearsay, an emotional interview of the minor child by her grandmother," which "critically affected the fairness of the trial." There is no doubt that the June video captured A.M. in a very distraught state. However, we find it telling that, at trial, the defense objected to the admission of the June video only on hearsay grounds. Defense counsel did not argue, under Maryland Rule 5-403, that the June video should be excluded because the probative value of this cumulative evidence was substantially outweighed by the danger of unfair prejudice.

We acknowledge that the State replayed the June video in its closing argument and alluded to the June video again in its rebuttal argument. However, we have no doubt that, if the State had omitted all mention of the June video from its arguments (and the trial as a whole), the verdict would have been the same, given the other sources of the same information that the State also referenced.

Finally, the jury's acquittal of Petitioner on the sexual offense count based on the allegation of cunnilingus is significant. In the June video (and in her interview with Dr. Shukat), A.M. stated that Petitioner engaged in cunnilingus. In her interview with Ms. Colandreo, A.M. did not mention cunnilingus. And, at trial, A.M. answered "No" when asked if Petitioner "ever [did] anything with his mouth on your body." The jury's acquittal of Petitioner on the charge based on cunnilingus reflects that the jury did its job

38

dispassionately and was not swayed by the emotional nature of the June video. The jury considered and rejected Petitioner's theory that C.M. pressured A.M. into falsely accusing Petitioner of sexual abuse in 2015, and that A.M. persisted in advancing such false claims at trial almost four years later. There is no reason to believe that, without the June video, the jury would have been any more receptive to the defense's theory. Indeed, without the June video, which showed that C.M. was able to evoke an emotional response from A.M., we believe the defense's theory would have gained less traction with the jury than it did with the June video in evidence.

In sum, our review of the full trial record convinces us beyond a reasonable doubt that the admission of the June video was "unimportant in relation to everything else the jury considered on the issue in question." *Bellamy*, 403 Md. at 332-33 (internal quotation marks and citations omitted). In other words, the June video did not contribute to the verdict. Its admission was harmless beyond a reasonable doubt.

## IV

## Conclusion

We reaffirm the analysis articulated in *Dorsey* as the standard for harmless error review in Maryland. In order for an error to be deemed harmless, the reviewing court must be convinced, beyond a reasonable doubt, that the error in no way influenced the verdict. Our review of the full trial record of this case convinces us beyond a reasonable doubt that the admission of the June 2015 video was harmless. It was cumulative of evidence that the jury heard from several other sources. In addition, the State introduced DNA evidence that

39

connected Petitioner to the crimes. Accordingly, we affirm the judgment of the Court of

Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Montgomery County
Case No.: 128021C
Argued: February 7, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 32

September Term, 2021

_____

DANIEL JAY GROSS

v.

STATE OF MARYLAND

_____

\*Getty, C.J.
\*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Dissenting Opinion by Gould, J., which
McDonald, J., joins.

_____

Filed: August 26, 2022

\*Getty, C.J. and McDonald, J., now Senior
Judges, participated in the hearing and
conference of this case while active members of
this Court. After being recalled pursuant to
Maryland Constitution, Art. IV, Section 3A, they
also participated in the decision and adoption of
this opinion.

Although I agree with the Majority's reaffirmation of *Dorsey v. State*, I respectfully dissent from the Majority's holding that the admission of the June video constituted harmless error.

As the Majority notes, this Court articulated the harmless error standard as follows:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed harmless and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.

*Dorsey*, 276 Md. 638, 659 (1976) (quotations omitted). Although the Majority reaffirms this standard in its opinion, it applies a different one - one that puts this Court in the position of speculating how the jury would have decided this case if the June video had not been admitted. *Gross v. State*, No. 32, Sept. Term 2021, op. at 33 (Md. Aug. 26, 2022) ("We have no doubt that, had the trial court excluded the June video, the verdict would have been the same."); at 39 ("There is no reason to believe that, without the June video, the jury would have been any more receptive to the defense's theory. Indeed, without the June video, which showed that C.M. was able to evoke an emotional response from A.M., we believe the defense's theory would have gained less traction with the jury than it did with the June video in evidence.").

Whether the jury would have reached the same verdict without the June video in evidence is not the test. As the Supreme Court stated in *Sullivan v. Louisiana*,

> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the

error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

508 U.S. 275, 279 (1993).

Having pocketed the conviction, it is easy and risk-free for the State to now insist that the video did not contribute to the guilty verdict. But let's look at it from the State's perspective once the evidence was closed, just before closing arguments. The State had to assess the strength of the evidence in the same way, and on the exact same information, as we do here, albeit without the benefit of hindsight. The State had to make judgment calls about what to argue and which evidence to emphasize. The State knew that the video's admissibility was vigorously contested, and that the issue would likely be revisited on appeal. The State had to have known, therefore, that the more it emphasized the video, the greater the chance a resulting conviction could be reversed on appeal if the appellate courts concluded that the video was inadmissible.

With all that information, the State evidently concluded that the risk of reversal was outweighed by the value the jury would likely attach to the video. And the State went all in, arguing at closing:

> The Defense wants you to believe that this videotaped disclosure by [C.M. and J.M.] was rehearsed, or staged, or whatever word you want to put there. I would submit to you that those disclosures are powerful, and they are heart-wrenching, and they're very different from the other videos that were admitted into evidence. And I encourage you to watch all of them, but I would like to show you the disclosure again.

And then after playing the video, the State continued in its closing: "The Defense wants you to believe that that was staged . . . . This isn't something that was said to this

2

child to say. This is this child relaying the experience of what happened to her to her grandmother." And then in rebuttal, the State returned to the video, this time arguing that the video and other pictures show that A.M. loved the petitioner: "She loved him, and if that raw, powerful heart-wrenching video doesn't convince you of that fact, [the pictures] are another reason[.]"

Thus, when the State did not have the benefit of hindsight and had to choose between emphasizing or omitting the June video in its closing, the State was not willing to risk an acquittal by doing the latter. Clearly, the State hoped and intended that the video *would* contribute to a guilty verdict even though there was other evidence on which the jury could have convicted Mr. Gross. Because I cannot fathom that the video did not have such an effect on at least one juror, I respectfully dissent.

Judge McDonald has authorized me to represent that he joins this dissent.